[File No. 6442.]

STATE OF NORTH DAKOTA EX REL. P. O. SATHRE, Attorney General of the State of North Dakota, Respondent, v. E. C. ROBERTS, Appellant.

(269 N. W. 913, 108 A.L.R. 37.)

Opinion filed November 19, 1936.

*Simpson, Mackoff & Kellogg,* for appellant.
*J. P. Cain,* Special Assistant Attorney General, for respondent.

BURKE, Ch. J.   This is a proceeding in quo warranto.

A sufficient petition, signed by Jacob Mehrer, William Rohlf, Joe Fix, and John Kraus, citizens of the United States, freeholders, residents, and voters of Hettinger county, prays that the Attorney General prosecute an action in quo warranto in the case of State of North Dakota against the said E. C. Roberts to determine the rights of said Roberts to said office.   On this petition the Attorney General duly

ordered the bringing of this action and the appointment of Honorable J. P. Cain as Special Assistant Attorney General to prosecute said writ of quo warranto at the expense of the said Henry Barry, who executed a bond with sureties for costs.

The writ of quo warranto was issued and served upon the defendant, E. C. Roberts, on the 14th day of July, 1936. The defendant, on the 21st day of July, 1936, appeared specially and objected to the jurisdiction of the court. The objection was overruled and the defendant submitted a demurrer on the grounds that (1) the information and complaint in quo warranto does not state facts sufficient to constitute a cause of action. (2) That several causes of action have been improperly united and that such attempts to set forth a cause of action for the removal of the defendant, and also one for the collection of salaries, fees, and money received by the defendant, and also seeks to reinvest one Henry Barry with the office.

The demurrer was sustained as to that part of the information or complaint applying to the collection of salaries, fees, and money received, and overruled on the question of the title or right to the possession of the office.

The defendant then claimed, as a matter of right, time to plead upon the theory that by § 7969, Compiled Laws 1913, the writ of quo warranto had been abolished and the remedies formerly obtained under the writ were now obtained by civil action, which only could be commenced by the service of summons as in other civil actions and that the defendant, as a matter of right, was entitled to thirty days after the service of the summons to answer the complaint or information, which contention was overruled by the court. The defendant was required to plead forthwith, and did duly file his answer, stating in substance—that the said Henry Barry was elected to the office of county judge and clerk of the district court of Hettinger county; that he qualified and continued to act until on or about the 4th day of April, 1936; that on the 4th day of April, 1936, the commissioners of insanity of Hettinger county found Henry Barry to be insane and a fit subject for treatment and custody in the North Dakota Hospital for Insane; that said Henry Barry was duly committed to the hospital for the insane at Jamestown, North Dakota and that the said office of county judge and clerk of the district court of Hettinger county was and

became vacant, and on the 6th day of April, 1936, the board of county commissioners of Hettinger county, by resolution, duly declared the office of county judge and clerk of the district court to be vacant and then and there appointed to said office of county judge and clerk of the district court· the defendant, E. C. Roberts.

The trial judge found all the facts favorable to the said Henry Barry and that the said E. C. Roberts did on or about the 6th day of April, 1936, usurp and intrude into and since said time has unlawfully held and attempted to exercise the office of county judge and clerk of the district court of the county of Hettinger.

As a conclusion of law the court found that the finding and determination of the board of commissioners of insanity of the county of Hettinger and State of North Dakota, made and entered on the 4th day of April, 1936, adjudging the said Henry Barry to be a fit and proper person for treatment at the State Hospital for Insane at Jamestown, North Dakota, was not and did not constitute a judicial determination of the said Henry Barry's sanity or insanity and, therefore, the resolution of the county commissioners declaring the office of county judge and clerk of the district court vacant because of such determination and the appointment of E. C. Roberts as county judge and clerk of the district court on April 6, 1936, was in all things null and void.

Judgment was duly entered and a stay of execution being refused the said Henry Barry was duly installed in the office of county judge and clerk of the district court of Hettinger county and the defendant duly appeals.

There is no merit in the defendant's contention that the writ of quo warranto is abolished by § 531 of the Code of Civil Procedure of 1877, § 7969, Compiled Laws 1913, which reads as follows: "The remedies formerly attainable by the writ of scire facias, the writ of quo warranto and proceedings by information in the nature of quo warranto may be obtained by civil action in the district court under the provisions of this chapter and of chapter 27."

If this section, which became a law in 1877, abolished the writ of quo warranto and proceedings by information in the nature of quo warranto, as appellant contends, then the power to issue the writ was duly restored by § 87 of the Constitution adopted in 1889, and which provides: "It (the Supreme Court) shall have power to issue writs

of habeas corpus, mandamus, quo warranto, certiorari, injunction and other original and remedial writs as may be necessary to the proper exercise of its jurisdiction, . . ." and § 103 of said Constitution confers the same power upon the district courts; but § 7969 does not repeal or abolish the writ of quo warranto. It simply provides that the remedies formerly attainable by such writ or information may be obtained by a civil action.

This very question was before the South Dakota court in the case of Wright v. Lee, 4 S. D. 237, 55 N. W. 931. At page 933 of 55 N. W., the South Dakota court said: "In our former opinion, it was suggested that the state might proceed under §§ 5345, 5346, Comp. Laws, providing that the remedies heretofore reached by writ of quo warranto, and proceedings by information in the nature of quo warranto, might be obtained by civil action, as provided in said sections. Against this suggestion, appellant contends that said sections were, by implication, repealed by the state Constitution, and that, in any event, they are inapplicable in the case of a foreign corporation. In our judgment, neither contention can be maintained. In People ex rel. Atty. Gen. v. Dashaway Asso. 84 Cal. 114, 24 P. 277, 12 L.R.A. 117, cited by appellant in support of the theory of repeal, the facts were not as here. There the legislature had expressly abolished the writ of quo warranto, and proceedings by information in the nature of quo warranto, and by the same section, and in continuous language, provided that the remedies obtainable under the abolished writ and proceedings might thereafter be obtained by civil actions, in the manner thereinafter provided. Code Civ. Proc. 1872, § 802. But here the territorial legislature made no attempt to abolish either. Such an attempt would have been abortive, if undertaken, for the powers and jurisdiction of the territorial courts were established by the organic act, and included the power and right to issue all common-law writs. The civil action provided by those sections was therefore not exclusive, but cumulative. In the California case, however, the legislature abolished the writ, and in the same breath provided for a new remedy. The two provisions were evidently intended to be interdependent, so that there might have been reason for holding that the new constitution, which restored the abolished writ, also had the effect of repealing the provision for a substitute; but in that case even the court did

not go to that extent. It simply recognized the fact that such contention might be made, and, without passing upon the question, suggested the answer that, even if the claim of implied repeal were allowed, the power of the court was quite as broad under the writ of quo warranto as under the statute claimed to be repealed."

Clearly § 7969 does not abolish the writ of quo warranto, or the proceedings by information in the nature of quo warranto, but is simply additional and cumulative legislation.

A judgment in quo warranto proceedings of ouster from a public office divests the person ousted of all authority, is self-executing, and not suspended by an appeal bond or supersedeas. 3 Am. Jur. § 565, p. 208; People ex rel. Dibelka v. Reinberg, 263 Ill. 536, 105 N. E. 715, L.R.A.1915E, 401, Ann. Cas. 1915C, 343; State ex rel. Caldwell v. Wilson, 121 N. C. 480, 28 S. E. 554, 61 Am. St. Rep. 672; Fawcett v. Superior Ct. 15 Wash. 342, 46 P. 389, 55 Am. St. Rep. 894 and annotations 899.

The sole question in the case is, was Barry judicially determined to be insane, and this question, on the agreed facts, is a question of law for the court and there was no error in refusing the demand for a jury trial.

The application for the admission of Barry to the State Hospital for the Insane was made by Dr. O. C. Maercklein, a member of the insanity commission of Hettinger county, under § 2551, Compiled Laws 1913, and on the same day he made his return to the commission stating that it was the patient's first attack, that it was increasing, that the patient was addicted to the use of alcohol, and the disease was supposed to be caused by intemperate use of alcohol. On the same day the commission made its findings that said "Barry is an insane person and a fit subject for treatment and custody in the North Dakota Hospital for Insane" warrant was issued and Barry was committed to the asylum where he remained for two weeks when he was discharged by the superintendent on the 18th day of April, 1936.

While Barry was in the insane asylum and on the 6th day of April, 1936, the county commissioners by resolution declared the office of county judge and clerk of the district court vacant and duly appointed the defendant Roberts judge of the county court and clerk of the district court of Hettinger county.

Under subdivision 2 of § 683, Compiled Laws 1913, an office becomes vacant when the incumbent is judicially determined to be insane.

It is the contention of the appellant that Barry was judicially determined to be insane by the finding of the commissioners of insanity and because of such judicial determination the office of county judge and clerk of the district court became vacant and the appointment of defendant was legal.

The remaining question then is, is the finding of the commissioners of insanity a judicial determination?

The law creating the commissioners of insanity is no part of any Judicial Code, but a part of the Political Code. It was passed in 1879 and was entitled "An Act Establishing the Dakota Hospital for the Insane, providing for the Government of the same, and for the care of the Insane, and for the Organization of a Board of Commissioners of Insanity in each Organized County of this Territory."

Section 2547, Compiled Laws 1913, provides: ". . . there shall be a board of commissioners consisting of three persons, to be styled 'commissioners of insanity,' two of whom shall constitute a quorum. The county judge shall be a member of such board and its chairman. . . . In case of the temporary absence from the county of the county judge or his inability to act, the state's attorney shall act in his place and stead."

The chairman of the board shall sign and issue all notices, appointments, warrants, subpœnas; he shall sign and carefully preserve all papers connected with any inquest; he shall keep separate books in which to record the proceedings of the board; but nowhere in the act does it require him to enter any judgment. He is just a member of the commission except that he is chairman and issues, signs, and files records. The law requires that such commission shall have cognizance of all applications for admission to the hospital or for the safekeeping of insane persons within their county, except in cases otherwise especially provided for. The law provides that applications for admission to the hospital must be made in writing in the nature of an information verified by affidavit. On the filing of any information the commissioners shall at once investigate the grounds of such information. For this purpose they may require that the person for whom

such admission is sought be brought before them and that the examination be had in his presence and they may issue their warrant therefor. Such warrant may be executed by the sheriff or any constable of the county, or if they shall be of opinion from such preliminary inquiries as they may make, and in making which they shall take the testimony of the informant if they deem it necessary or desirable, and of other witnesses if offered, that such course would probably be injurious to such person or attended with no advantages, they may dispense with such presence. On the return of physician's certificate (the physician having been appointed to examine the patient) the commissioners shall as soon as practicable conclude their investigation and having done so shall find whether the person alleged to be insane is insane; whether, if insane, a fit subject for treatment and custody in the hospital. If they find such person is not insane, they shall order his discharge, if in custody. If they find such person insane, and a fit subject for treatment and custody in the hospital, they shall forthwith issue their warrant and a duplicate thereof, stating such finding, with the residence of the person, if ascertained. Such warrant and duplicate with the finding and certificate of the physician shall be delivered to the sheriff of the county, who shall execute the same by conveying such person to the hospital and delivering him with such duplicate and physician's certificate and finding to the superintendent.

The state of Oklahoma adopted and passed the North Dakota law, relating to the admission to the asylum, without amendment and it is chapter 52 of the Compiled Laws of Oklahoma for 1909 beginning on page 876 and ending on page 881.

It was first before the Oklahoma court in the case of Re Maas, 10 Okla. 302, 61 P. 1057. The court said: "An order of a board of insanity adjudging one to be insane has no bearing upon his legal mental status. The effect of such an order is to admit one to the territorial asylum for treatment; and it is not entitled to the faith and credit of a judgment of a court, as the members of such board do not act as judicial officers, but as a special board, clothed with special power only. . . . The boards of insanity are special boards created by law for a special purpose. It was only intended to clothe them with the power to determine who should be confined in the territorial asylum for treatment, and they have not the power to fix one's

legal status (that is to declare one to be, in law, sane or insane), and the fact that the probate judges are made members of these respective boards changes not the rule. When a probate judge acts in this capacity, he acts as any other member of the board, and not as a probate judge or as a probate court."

In the case of Norris v. Dagley, 64 Okla. 171, 166 P. 718, the court said: "Evidence was introduced to show that said defendant had been by the commissioners of insanity for Oklahoma county, committed to the asylum at Norman prior to the date of said note and mortgage. This did not constitute a judicial determination that said defendant was without capacity to enter into contracts. Said commissioners of insanity did not act in a judicial capacity, nor was a finding made by them a judicial determination that said defendant was insane." See also Aldrich v. Barton, 153 Cal. 488, 95 P. 900. To the same effect is Kirk v. McClendon, 94 Okla. 33, 220 P. 949.

Again in the case of Greenwood v. Wilkinson, 124 Okla. 300, 256 P. 46, the Oklahoma court said: "There is a distinction between the judicial finding by the county court that a party is insane or incompetent, for the purpose of appointing a guardian to take charge of his property and the finding by a board of insanity such boards being special boards created by law for a special purpose. It was only intended to clothe them with the power to determine who should be confined in the state hospitals for treatment, and they have not the power to fix one's legal mental status; that is, to declare one to be in law sane or insane, and the fact that the probate judges are made members of these respective boards changes not the rule. When a probate judge acts in this capacity, he acts as any other member of the board, and not as a probate judge or a probate court."

In the case of Knox v. Haug, 48 Minn. 58, 50 N. W. 934, the court, in construing a statute similar to ours, said: "Section 21 does not provide who—a public officer, a relative, or a stranger—may file the information; no writ or notice issuing from a court is provided for; the finding is not a record of any court (nothing but the duplicate warrant being filed in the office of the judge of probate)." (The same as in our statute.) "The only matter to be investigated is the alleged insanity and need of care and treatment. The degree of the insanity, except so far as necessary to ascertain if care and treatment be needed,

and its effect on the capacity of the person to do business or manage his property, need not be investigated. A person may be insane on some one subject, and still be as able as the sanest to manage his own property and affairs. Such a person might need and be a proper subject for care and treatment within the meaning of the section. So might a person for whom a guardian has been appointed under chapter 59. And it is significant that while chapter 59 prescribes for the finding of mental incapacity and the appointment of a guardian, and the effect on the person's capacity to make contracts, that followed a finding of lunacy under the writ de lunatico, § 21 of chapter 35, gives no other effect to the finding contemplated by it than that the person may be committed to the hospital. The purpose of the latter section is manifest. The state having established hospitals for those afflicted with mental diseases, the proceeding in that section is the mode provided for ascertaining who are proper subjects for the charitable care and attention thus provided. Chapter 59 provides the only statutory mode for determining the *status* of the person with respect to managing his own affairs."

In the case of Leinss v. Weiss, 33 Ind. App. 344, 71 N. E. 254, the Indiana court sustained the following instruction, namely: "The court instructs you that an inquest of insanity held by two justices of the peace upon the alleged insanity of any person or inhabitant of their county, and their certificate that said person therein named is insane and a proper subject for treatment in the hospital for the insane, is not a judgment of a court or equivalent thereto, nor is such finding and certificate equivalent to a verdict of a jury or a finding of a court that such person is of unsound mind and incapable of managing his own estate, its purpose being to establish the fact that such person is entitled to admission to a hospital for the insane for treatment, and will not be notice to persons who deal with such person in good faith, who have no knowledge or notice of such unsoundness of mind, where there is nothing in the manner, language, or conduct of such person to put them or any prudent man upon inquiry as to his sanity, and after he had been discharged from said hospital."

In the case of Fleming v. Bithell, 56 Idaho, 261, 52 P. (2d) 1099, the Idaho court said: "The commitment to the State Hospital South to which reference has been made was a summary proceeding before

the probate judge with the advisory assistance of physicians, under the provisions of title 64, chap. 2, I. C. A. (§§ 64–201 et seq.), a special proceeding for determining whether a person is 'so far disordered in his mind as to endanger health, person, or property' such as to justify the state in depriving him of his personal liberty and affording him the benefit of proper care and remedial aid. I. C. A., §. 64–204, provides for the subpœnaing of at least one graduate of medicine to appear and attend the examination, which physician must hear the testimony and must make a personal examination of the alleged insane person (I. C. A. § 64–206), and after hearing the testimony and making the examination, must, if he believes such person to be dangerously insane, make a certificate that such person is so far disordered in his mind as to endanger health, person, or property, etc., I. C. A., § 64–207. I. C. A., § 64–209, provides that if the judge, after such examination 'and certificate made' believes the person so far disordered in his mind as to endanger health, person, or property, he must make an order that he be confined to the insane asylum. The foregoing summary proceeding is in the nature of a hearing before a lunacy commission which determines whether or not the person is 'so far disordered in his mind as to endanger health, person or property,' and a commitment to the asylum thereunder is not a conclusive judicial determination of sanity or insanity, capacity or incapacity. The Supreme Court of California considering the provisions of §§ 2168 et seq. of the Political Code, the provisions of which are similar to the provisions of title 64, chap. 2, I. C. A., and §§ 38, 39 and 40 of the Civil Code of California, which provisions are almost identical with those of I. C. A., §§ 31–106, 31–107 and 31–108, heretofore quoted, has consistently determined that the proceedings before a judge with the advisory assistance of physicians is a summary proceeding for the purpose of determining mental condition and does not constitute a conclusive judicial determination of sanity or insanity, competency or incompetency, capacity or incapacity, nor the right to contract. In the course of the opinion in Fetterley v. Randall, 92 Cal. App. 411, 268 P. 434, the following language appears:

" 'On the 13th of March, 1922, and after a proceeding authorized by §§ 2168, 2169, and 2170 of the Political Code, viz., a hearing before a superior judge with two physicians present, sometimes referred

to as the "lunacy commission," respondent was ordered committed to the state hospital for the insane. . . .

" 'The proceedings before the judge, with the advisory assistance of two physicians, under the provisions of §§ 2168 et seq. of the Political Code, is a summary proceeding for the purpose of determining whether or not the person charged with being insane is in fact in such a mental condition as to justify the state in depriving him of his personal liberty and affording to him, if it is found needed, the benefit of proper care and remedial aid. It is not a conclusive judicial determination of sanity or insanity. . . . People v. Willard, 150 Cal. 543, 89 P. 124; . . . Kellogg v. Cochran, 87 Cal. 192, at page 198, 25 P. 677, 679, 12 L.R.A. 104. . . . People v. Prosser, 56 Cal. App. 454, 205 P. 869.' . . .

"And in People v. McConnell, 80 Cal. App. 789, 252 P. 1068, 1069, the court says: 'It has been held in this state that, in proceedings for the commitment of a person to a state hospital, there is no judgment roll in the sense that it determines conclusively anything; that the commission established in each county to ascertain the mental condition of one alleged to be insane is purely a creature of the statute, the sole duty of which is to inquire and determine whether the mental condition of the person examined is such as to warrant his detention in the asylum for treatment. It is not intended as a tribunal in which the status of the alleged insane person is fixed.' "

Smoot on Insanity distinguishes between a statutory provision for determining whether a person is a fit subject for commitment to the insane asylum and statutes declaring a person incompetent and providing a guardian for the care and custody of his property. On page 124, § 164, relating to the effect of an order for commitment for treatment to the asylum, the author says: "As the purpose and end of an order of commitment is not so much to fix the status of the person with reference to whom it is made, as to determine the present propriety or necessity of his commitment to an asylum, either for care, for treatment, or for restraint, such order is not considered as establishing such person's insanity further than necessary for the purpose in hand, and has not the force and effect of a regular inquisition. Indeed, it is somewhat uncertain whether such a commitment will in any

way affect the status of the person committed, except in a very limited way. . . ."

Thus far we have considered the law relating to the commitment of a person to the asylum for treatment; but there is also another and quite different law to determine a person incompetent and to provide a guardian for his person and property. Section 4474, Compiled Laws 1913, reads as follows:

"A person of unsound mind may be placed in an asylum for such persons upon the order of the county court of the county. in which he resides, as follows:

"1. The court must be satisfied by the oath of two reputable physicians that such person is of unsound mind and unfit to be at large.

"2. Before granting the order the judge must examine the person himself or, if that is impracticable, cause him to be examined by an impartial person duly sworn for that purpose.

"3. After the order is granted the person alleged to be of unsound mind, his or her husband or wife or relative to the third degree, may appeal to the district court and demand therein an investigation before a jury, which must be substantially in all respects conducted as under an inquisition of lunacy."

Under § 4458, "A guardian of the person or property or both of a person residing in this state, who is a minor or of unsound mind, may be appointed in all cases, other than those named in § 4456, by the county court as provided in the probate code." And § 8886 provides: "When it is represented to the county court upon verified petition of any relative or friend, that any person is of unsound mind or from any cause mentally incompetent to manage his property, the judge must cause such person to be cited as in other cases, except that the time of service may be the same as upon a motion." This contemplates a judicial proceeding in court. The parties will be brought into court by the service of the citation or notice, which must be done to satisfy the due process clause of the Constitution.

In the case of McKinstry v. Dewey, 192 Iowa, 753, 185 N. W. 565, 23 A.L.R. 587, Judge Faville, speaking for the Iowa court, said: "The sole question for our determination is whether or not, under the statutes of this state, a judge of the district court, upon presentation

of a petition of this character, can legally appoint a temporary guardian of the person and property of an alleged incompetent, without giving notice to such person of the application for the appointment of said temporary guardian. . . . This proceeding is not to be confused with proceedings for the commitment of an insane person to the hospital for the insane. That is an altogether different matter, and the method to be pursued, and remedy sought, are altogether different from those in a proceeding for the appointment of a guardian. We have held that the investigation into the question of insanity before the board of commissioners of insanity may be had without notice to the person suspected of being insane. Chavannes v. Priestley, 80 Iowa, 316, 45 N. W. 766, 9 L.R.A. 193; Black Hawk County v. Springer, 58 Iowa, 417, 10 N. W. 791; Bisgaard v. Duvall, 169 Iowa, 711, 151 N. W. 1051; Corcoran v. Jerrel, 185 Iowa, 532, 170 N. W. 776, 2 A.L.R. 1579.

"In proceedings like those under consideration in the instant case, the object is not the care and confinement of a lunatic in the state hospital for the insane, but solely the appointment of a guardian of the person or property of one alleged to be incompetent. Under the statute, the petition may be presented to the judge by any person."

In the case of Chase v. Hathaway, 14 Mass. 222, the supreme judicial court of Massachusetts said: "There being no provision in the statute for notice to the party who is alleged to be incompetent, by reason of insanity, to manage his estate, it seems that the judge of probate did not think such notice essential to his proceeding. But we are of opinion that, notwithstanding the silence of the statute, no decree of a probate court, so materially affecting the rights of property and the person, can be valid, unless the party to be affected has had an opportunity to be heard in defense of his rights.

"It is a fundamental principle of justice, essential to every free government, that every citizen shall be maintained in the enjoyment of his liberty and property, unless he has forfeited them by the standing laws of the community, and has had opportunity to answer such charges as, according to those laws, will justify a forfeiture or suspension of them." See also Wait v. Maxwell, 5 Pick. 217, 16 Am. Dec. 391; Hathaway v. Clark, 5 Pick. 490.

The Iowa statute did not require notice and the appointment of a guardian was held void.

The case of McKinstry v. Dewey, 192 Iowa, 753, 185 N. W. 565, 23 A.L.R. 587, supra, is cited in C. J. as the leading case on the question of the appointment of a guardian for the person and property of an incompetent person. The cases on that subject are cited and discussed at length in the annotations which follow, holding that the appointment of such a guardian without notice is void as violative of the due process clause of the Constitution.

The case of Corcoran v. Jerrel, 185 Iowa, 532, 170 N. W. 776, 2 A.L.R. 1579, supra, was an action for damages for committing a person to the asylum without notice. The Iowa statute regulating the commitment of persons to the insane asylum is practically the same as the statute of North Dakota. It does not require notice when the application is made for admission to the asylum. The information was filed, warrant was issued and delivered to the sheriff who took the plaintiff into custody; but she was not taken before the commissioners. A practicing physician appointed by the board made a personal examination and certified in writing to the commission that in his opinion she was a fit subject for custody and treatment at the hospital. The defendant, Dr. Jerrel, who had been previously her physician testified that in his judgment plaintiff was insane and should be sent to the hospital for care and treatment. She was sent to the hospital where she remained for five months and on her release she brought the action for damages for false imprisonment upon the theory that proceedings without a formal notice to her were void as violative of the due process clause of the Constitution. The court said: "While the legislature has not made provision for notice of the hearing before the commission, it has made ample provision for safeguarding persons thus accused. Section 2267 of the Code provides for an appeal from the finding of the commissioners to the district court, and § 2268 requires that the accused be discharged from custody, pending such appeal, unless the commissioners find that his condition is such that he cannot with safety be allowed to go at large. Section 2304 provides that, upon petition to a district judge, a commission may be appointed to examine a person confined in a hospital and determine whether he is insane, and this proceeding may be repeated every six months.

Section 2306 also provides, in substance, that all persons confined as insane shall be entitled to the benefit of a writ of habeas corpus, and that the question of insanity shall be decided at the hearing thereon."

The only difference between the Iowa statute and the North Dakota statute is that under the Iowa statute the person committed has the right of appeal to the district court and under the North Dakota statute there is no appeal.

The court further said in Corcoran v. Jerrel, 185 Iowa, 532, 170 N. W. 776, 2 A.L.R. 1579, supra, "We held in Black Hawk County v. Springer, 58 Iowa, 417, 10 N. W. 791, that: 'The inquest of lunacy by a board of commissioners is in no sense a criminal proceeding. The restraint of an insane person is not designed as punishment for any act done. The insane are, by the law, taken into the care and custody of the state, for treatment for their unfortunate infirmity.'"

From these decisions it is clear that our statutes relating to the admission of persons to the insane asylum are summary proceedings in the nature of a police regulation for public safety and to provide medical treatment for persons suffering from mental ailments. The determination is more or less temporary in its effect. It is not the action of any court and while the county judge is a member of the commission he does not act in a judicial capacity but simply as a member of the commission. No order for judgment is signed and no judgment is entered. The county judge cannot order judgment because he is not acting as county judge but only as a member of the commission and its finding can in no sense be called a judicial determination.

In the instant case the finding of the commissioners of insanity was not a judicial determination of the sanity of Barry. It follows that there was no vacancy in the office of the judge of the county court and the clerk of the district court of Hettinger county, and the judgment is affirmed.

CHRISTIANSON, BURR, NUESSLE, and MORRIS, JJ., concur.