In re Estate of Carrie H. Hunter, Deceased. Bertha P. McKim, appellee, v. Elmore Y. Abbott, appellant.

39 N. W. 2d 418

Filed October 27, 1949. No. 32621.

*Charles W. Phillips,* for appellant.

*Chambers, Holland & Groth,* and *Roy V. Nelson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This is an appeal from the judgment denying probate of an instrument dated October 17, 1947, as the will of Carrie H. Hunter, deceased.

Carrie H. Hunter was a resident of the city of Lincoln. She died on the 19th day of October 1947, and left an instrument purporting to be her will in which Elmore Y. Abbott, a nephew, was named as sole beneficiary. Proceedings in the county court resulted in its probate. The contestant, Bertha P. McKim, appellee, appealed. The proponent, Elmore Y. Abbott, is the appellant. The ground of the contest in the district court was that the deceased at the time of the execution of the document in question did not have testamentary capacity. The trial resulted in a verdict adverse to the proponent and a judgment denying probate. The motion of proponent for a new trial was overruled.

Appellant assigns as error the submission to the jury of the issue of the mental competency of the testatrix to make a will. The contest of a will on the charge that the testator was mentally incompetent to make a will imposes the burden upon the proponent throughout the litigation to prove by the greater weight of the evidence the testamentary capacity of the testator at the time it was executed. The burden of proof does not shift, but the burden of going ahead, as some authorities state it, does. The proponent must make, at least, a prima facie case as to this requirement. The burden is then on the contestant to introduce sufficient evidence to support a finding by a jury that the testator did not have testamentary capacity, and failing so to do, there is no question to submit to a jury in such a case. In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203; In re Estate of Johnsen, 149 Neb. 34, 30 N. W. 2d 70; In re Estate of Kaiser, 150 Neb. 295, 34 N. W. 2d 366.

Proponent introduced all his evidence in making his case-in-chief. He made much more than a prima facie case and produced sufficient evidence to have sustained a verdict if one had been returned in his favor that the instrument in question was the will of the deceased. In this situation a statement of the evidence of the proponent is not required.

A defeated litigant in a will contest is not entitled to a trial de novo on appeal from the judgment of the district court. An issue of fact in such a contest is determined in this court by the sufficiency of the evidence to sustain the verdict of the jury, and in testing the sufficiency thereof to support the verdict it will be considered in the light most favorable to the successful party, any controverted fact will be resolved in his favor, and he will be given the advantage of any inferences that can reasonably be deduced therefrom. In re Estate of Johnsen, supra; In re Estate of Witte, supra; In re Estate of Kaiser, supra; Fimple v. Archer Ballroom Co., 150 Neb. 681, 35 N. W. 2d 680.

The elements of mental competency to make a will are that the testator understands the nature of his act in making the will, the nature and extent of his property, the proposed disposition of it, and the natural objects of his bounty. In re Estate of Johnsen, *supra.* It devolved upon the contestant to negative one or more of these to justify a conclusion that the testatrix did not have testamentary capacity.

The record contains evidence tending to establish the following relative to the issue of mental capacity of the testatrix at the time the will was executed. When she signed the will on October 17, 1947, she was 78 years of age, and died on the morning of the second day thereafter. She was seriously ill in the hospital as early as September 30, 1947, suffering from nausea and shingles, and was "most uncomfortable." After she had been in the hospital for about two weeks she was confused and thought she was in the home of a nephew. She was semi-comatose at times. During the week before her death she developed edema, and puffiness of her hands and feet and around her eyes. She had lucid and semi-comatose intervals, an impediment in her speech caused by the edema, and her mouth was very dry most of the time because she had difficulty in retaining fluids. "In her general condition it didn't seem possible for a person to live. She was extremely ill and her age of course was a contributing factor." Before the will was made she at times talked incoherently, was confused, thought she was in the home of her sister, on occasions was "out of her head," would not respond, circulation was poor, moaned but did not move, did not seem to have strength to move, her eyes were "coated with film," was in such condition that she could not turn herself in bed, and had been bedfast for at least 20 days before her death. Her illness was serious enough that the nurse thought many times while she was with the testatrix that she was going to die. At 2:45 a. m., October 18, only hours after the will in ques-

tion was made, the testatrix had a violent convulsion of about 30 seconds' duration, frothed from the mouth, lost consciousness, and had alternately sudden extreme tension and relaxation of muscles at repeated intervals. Later she had marked swelling of the eyeballs, the feet, and hands, her circulation was bad, and she died less than 48 hours after the will was executed. Mr. Chapman, who prepared the will, observed that she was physically ill, had difficulty in talking, was difficult to understand, could hardly hold the pen to sign the will, and asked for someone to "hold my hand, and direct my hand" which was done. The other witness to the will stated that when she talked with the testatrix before the will was signed and attested that she stated "she had one heir." A nephew of the testatrix and his wife came from Des Moines, Iowa, to Lincoln on October 15, 1947. They were at the hospital and saw his aunt twice that evening and once on the following day. She had been cared for in their home for about six weeks immediately prior to September 1, 1947. Her condition was so bad when they saw her in the hospital they could get no response or recognition from her. "She was in a terrible condition * * * and her eyes were set." John C. Thompson, a specialist in diagnosis and internal medicine of 28 years practice, first saw the testatrix on the 31st day of May 1947, in the hospital when she appeared very seriously ill with an outstanding symptom of anemia. His examination demonstrated that she was not suffering from pernicious anemia, but had many of the factors involved in that disease, and had had a high blood pressure over a period of years. Associated with the high blood pressure was a kidney condition which caused them to fail to eliminate the poison from her body. Instead of having 100 percent elimination in a given time, only 10 percent of the waste accruing in her body in such interval was discharged, and this condition afforded the reason for the effect which was the limitation of the reproduction of blood. The treatment

at that time included blood plasma, transfusions, and much medication. He cared for her in the hospital until about the middle of July 1947. When she was permitted to leave the hospital the doctor testified that her condition was "chronic and progressive" and he knew she would suffer recurrences of her trouble. She returned to the hospital and the doctor was again consulted sometime before October 1, 1947. He saw her thereafter once each day until her death. She complained of severe pain around her hip. A very serious eruption appeared, and it was determined that she had shingles. She was anemic, weak, and gave the symptoms of which she complained when she was in the hospital earlier. Her pain aggravated her other difficulties and for as much as ten days before she died her attendants were hardly able to arouse her. She had marked stiffness and rigidity due to the effect of pressure on the brain known as an encephalopathy. For days before her death she was confused to the extent that it was almost impossible to get an intelligent answer from her or to arouse her. Her mentality had become very definitely affected. There was a continual development of brain deterioration from the time he first saw her in the hospital and during the period of which October 17 was a part. She laid immobile in bed, was moved by a nurse, and for the most part "she was just almost a vegetable. She was living, but she didn't know what was going on around her." She had a physical condition that made her mentally incompetent. Tissue of the body requires blood to be brought into it to maintain its activity, and any condition which prevents this causes the tissue to close up. Her brain could not get blood and it did not do a lot of things it should have done. The disease from which she was suffering was progressive and was not a "fly-by-night process, from day to day or night to night." It was difficult to do anything with the anemia with which she was afflicted and this resulted in a condition by which the tissues of her brain were affected

to the extent there was a softening in it. Any person with this kind of trouble appears sometimes to be thinking, but he is incapable of thought or comprehension. She did not know anything. Her arms were rigid and the thing that positively showed her brain involvement was the fact that she could be raised by her head and her body would come up as if she were a solid mass. A constant irritation was present and so bad for several days before her death that nothing more could be done for her. He expressed an opinion that on the 17th day of October 1947, she did not have mental capacity to know the nature and extent of her property or to know the natural objects of her bounty or who her heirs or relatives were; that in the last two weeks or ten days of her life she did not have mentality enough to know anyone; that she was not competent to execute a will; and did not have the mentality or capacity to transact any business of any kind.

An examination and evaluation of the evidence results in the conclusion that it is of such a nature that it could reasonably have convinced the jury that the incompetency alleged had been established. The assignment of the appellant that the verdict is without competent evidence to sustain it, and that a verdict for him should have been instructed by the court, is not sustained and must be denied.

The proponent also bases error on the failure of the court to instruct the jury that after the proponent had made a prima facie case a presumption arose that the testatrix had testamentary capacity and that the presumption continued until overcome by evidence produced by the contestant. There was no instruction tendered the court to that effect. A party desiring a more explicit instruction than that given should offer such an instruction. If the instructions are not sufficiently specific in some respect, it is the duty of counsel to offer a request for an instruction that will supply the omission, and unless this is done, the judgment will not ordinarily

be reversed for such defect. If an instruction is given to a jury, which it is claimed did not fully state the rule of law upon the subject involved therein, but did not misstate any rule to be applied, the attention of the court should be called to the omission, as claimed, by an instruction containing the alleged omission, otherwise there can be no ground for reversal therefor. Plumb v. Burnham, *ante* p. 129, 36 N. W. 2d 612.

The court advised the jury that if Carrie H. Hunter, when she executed the will, had the ability to understand the nature of her act, the extent of her property, the proposed disposition of it, and the natural objects of her bounty, it should find that she had mental capacity to make a will; that the question for its determination was whether or not she had capacity to make a will on October 17, 1947; that the burden was on the proponent to establish by a preponderance of the evidence that on that date she had such capacity; and if from a preponderance of the evidence and the instructions the jury found she had mental capacity to make a will, then the verdict of the jury should be that the instrument in controversy was the last will and testament of Carrie H. Hunter, deceased. These instructions were correct and adequate. The essential elements of testamentary capacity were accurately stated. In re Estate of Johnsen, *supra*. The burden of proof in this case was on the proponent throughout the trial. If he sustained it by the greater weight of the evidence, he was entitled to a verdict that the questioned instrument was the will of the deceased. In re Estate of Witte, *supra*.

The presumption that the testatrix had mental capacity to make a will created by the prima facie case of the proponent was not evidence, and when evidence sufficient in quality was produced to rebut it, the presumption disappeared. The rule is that a presumption is not evidence, but it may take the place of evidence unless and until evidence appears to overcome or rebut it, and when evidence sufficient in quality appears to

rebut it, the presumption disappears, and thereafter the determination of the issue depends upon the evidence, with the requirement as in other civil actions that the party having the affirmative of the issue involved in order to succeed will sustain his position by a preponderance of the evidence. In re Estate of Drake, 150 Neb. 568, 35 N. W. 2d 417. The error claimed by proponent in this regard is without substance.

The judgment of the district court should be, and is, affirmed.

AFFIRMED.