Bennie O. JOHNSON by Duane Davis, his Guardian, Plaintiff and Respondent,

v.

Winnifred Margaret JOHNSON, Defendant and Appellant.

No. 7842.

Supreme Court of North Dakota.

April 21, 1960.

Rehearing Denied July 16, 1960.

Daniel S. Letnes and Philip Bangs, Grand Forks, Jansonius, Fleck, Smith, Lynch, Mather & Strutz, Bismarck, for defendant-appellant.

Day, Stokes, Vaaler & Gillig, Grand Forks, for plaintiff-respondent.

DOUGLAS B. HEEN, District Judge.

The plaintiff, Bennie O. Johnson, by Duane Davis, his guardian, brought this action for annulment of marriage on the grounds that plaintiff, at the time of marriage to defendant, was feeble-minded, a common drunkard and afflicted with a contagious disease, all or any of which, it is alleged, would prevent his marriage under the laws of this state.

The district court, after hearing the evidence, found that plaintiff at the time of marriage was of unsound mind and was incompetent to the extent that he did not understand the duties and obligations of the marriage relationship. The defendant has appealed from such judgment and demands a trial de novo in this court.

The evidence establishes that plaintiff, Bennie O. Johnson, was previously married and that his wife died in January 1952. Prior to her death, plaintiff and his then wife visited in Canada, and while on such trip made the acquaintanceship of a Mrs. Speirs. Following the death of his first wife, plaintiff in the summer of 1953 again made a trip to Canada and renewed such acquaintanceship, which ripened to the extent that Mrs. Speirs made visits to North Dakota to visit plaintiff. It appears that plaintiff was addicted to the use of intoxicating liquor, and in May 1955 entered a hospital for treatment of delirium tremens and a liver condition, remaining in the hospital until June 22, 1955, when he entered the State Hospital and there remained under treatment and observation until July 11, 1955, when he was released or paroled to his attorney, Cyrus Lyche. Mr. Lyche arranged for plaintiff to enter a private mental hospital in Minnesota, and on or about July 12, 1955, plaintiff entered the latter hospital as a patient, and was released therefrom about September 9, 1955.

During plaintiff's stay at the Minnesota hospital, he received medical and psychiatric care, and for much of this time Mrs. Speirs stayed near the hospital. Certain other of plaintiff's relatives also visited him during this confinement.

While such a patient, on August 31, 1955, plaintiff secured a Minnesota marriage license, naming himself and Winnifred Speirs, the defendant herein, as principal parties.

After leaving the Minnesota hospital about September 9, 1955, the plaintiff, Mrs. Speirs and Mr. Lyche began the return trip to North Dakota, stopping en route for plaintiff to give a specimen for a blood test for social disease.

Prior to release from the Minnesota hospital, certain interested relatives filed a petition for the appointment of a guardian of the person and property of plaintiff, and a hearing on such petition was set by the county court for September 30, 1955. On September 16, 1955, plaintiff and defendant were married at Detroit Lakes, Minnesota. Following such marriage, and on the same day, the parties went to Fargo, North Dakota, where the services of an attorney, Mr. J. Gerald Nilles, was secured and an interview had for preparation and purpose of opposing the petition for guardianship. Apparently several interviews between plaintiff and Mr. Nilles took place prior to the guardianship hearing on September 30, 1955, at which date evidence was received by the county court, and the hearing continued until October 7, 1955, when further proof was adduced. On October 19, 1955, the county court issued its order dismissing petition for appointment of guardian for Bennie O. Johnson, and finding "that he is of sound mind; that he is competent to manage his own property and affairs; that it is not necessary or convenient that a guardian be appointed either for the person or of the estate of the said Bennie O. Johnson."

It appears that plaintiff and defendant lived together for a short time, although the evidence is not clear in this respect, and the parties then separated. The record

contains charges and countercharges with respect to such separation, and it appears that plaintiff at one time commenced an action for divorce which was discontinued. Upon petition, a guardian, Duane Davis, was appointed for plaintiff on March 28, 1957, and the present action was instituted on April 1, 1957, which resulted in judgment for plaintiff, decreeing annulment of the marriage.

In this State, the formalities of the marriage relationship are wholly regulated and controlled by statute. Section 14-0301 ND RC 1943 provides that,

"Marriage is a personal relation arising out of a civil contract to which the consent of the parties is essential. The marriage relation shall be entered into, maintained, annulled, or dissolved only as provided by law."

Sec Schumacher v. Great Northern Ry. Co., 23 N.D. 231, 136 N.W. 85.

■ The consent contemplated by the terms of the above statute is a then present assent, freely, voluntarily and understandingly given, representing a mutual intention of marital relationship by competent contracting parties. For a general discussion, see 35 Am.Jur., Marriage, Section 20, page 192 et seq.; 55 C.J.S. Marriage § 18b, p. 840 et seq.

■ It is a general rule that marriage is regarded with favor by the law and such proposition is subscribed to in North Dakota. Woodward v. Blake, 38 N.D. 38, 164 N.W. 156, L.R.A.1918A, 88.

In North Dakota the presumption, by statute, is

"That a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Section 31-1103, subd. 30 NDRC 1943.

■ Where a marriage in fact has been proved, a presumption arises that such marriage is in all things valid. 34 A.L.R. 464 and 77 A.L.R. 730. And further, it is held, almost universal in application, that a person who has contracted a marriage is presumed to be mentally capable of legally contracting the marriage relationship. The burden of overcoming such presumption is upon the party attacking the validity of the marriage. 28 A.L.R. 652 and authorities there cited. 35 Am.Jur., Marriage, Section 113, page 251; 55 C.J.S. Marriage, § 58a, p. 937. While a presumption is not evidence of a fact and is not conclusive, yet presumptions are indulged in to supply the place of facts. Starkenberg v. North Dakota Workmen's Compensation Bureau, 73 N.D. 234, 13 N.W.2d 395.

■■ A presumption is a rule of law, the office of which is to place the burden of going forward with the proof upon the party contesting the validity of the marriage, and as stated in In re Drake's Estate, 150 Neb. 568, 35 N.W.2d 417, 423, a presumption takes the place of evidence,

" * * * unless and until evidence appears to overcome or rebut it, and when evidence sufficient in quality appears to rebut it the presumption disappears and thereafter the determination of the issues depends upon the evidence with the requirement as in other civil actions that the party having the affirmative of the issue involved in order to succeed shall sustain his position by a preponderance of the evidence."

■ In this connection see Headlee v. New York Life Ins. Co., 69 S.D. 499, 12 N.W.2d 313; McKiver v. Theo. Hamm Brewing Co., 67 S.D. 613, 297 N.W. 445; Peters v. Lohr, 24 S.D. 605, 124 N.W. 853; In re Hunter's Estate, 151 Neb. 704, 39 N.W.2d 418; Svihovec v. Woodmen Accident Co., 69 N.D. 259, 285 N.W. 447, 449.

Under the laws of this State:

"A marriage may be annulled by an action in the district court to obtain a

decree of nullity for any of the following causes existing at the time of the marriage: * * *

"3. That either party was of unsound mind, unless such party, after coming to reason, freely cohabited with the other as husband or wife; * * *" Section 14–0401 NDRC 1943.

Section 14–0307 NDRC 1943 provides:

"Marriage by a woman under the age of forty-five years or by a man of any age, unless he marries a woman over the age of forty-five years, is prohibited if such man or woman is a common drunkard, * * * an imbecile, a feeble minded person, an idiot, an insane person, * * * or a person afflicted * * * with any contagious venereal disease."

Section 14–0308 NDRC 1943 provides:

"All marriages contracted outside of this state, which are valid according to the laws of the state or country where contracted, shall be valid in this state. This section shall not apply when residents of this state contract a marriage in another state which is prohibited under the laws of North Dakota."

"It is the policy of this state, as expressed by Section 14–0308, supra, that the validity of marriages prohibited by the laws of this state when contracted outside of North Dakota by residents of this state will be determined according to our laws. In an annulment suit involving such a prohibited marriage, our statutes will govern, whether the marriage is void or voidable." First National Bank in Grand Forks v. North Dakota Workmen's Compensation Bureau, N.D., 68 N.W. 2d 661, 663.

■ It is established in this State, that although marriage of those persons designated in Section 14–0307, supra, is prohibited, yet a marriage contracted by those persons is rendered merely voidable and not void. First National Bank in Grand Forks v. North Dakota Workmen's Compensation Bureau, supra. Only in the instances of incestuous marriage, or marriage by a person having a former husband or wife while such former marriage was then in force, is the marriage a nullity. Michels v. Fennell, 15 N.D. 188, 107 N.W. 53; First National Bank in Grand Forks v. North Dakota Workmen's Compensation Bureau, supra.

■ The questioned marriage of the parties to this action, being voidable, must be directly attacked under an applicable statute. Such a direct attack upon the marriage in question has been made by the plaintiff pursuant to the annulment statute as above set forth.

At this point it should be noted that this is the second appearance of the parties in this Court and after long and bitter litigation the record is replete with recriminatory charges and statements which have no bearing upon the merits of this legal action. The issue here for determination is not the methods or character, good, bad or indifferent of the defendant wife or of other interested parties, nor whether the marriage in question in the opinion of relatives or others was hasty or ill advised, as common experience indicates that such many times is the wont of the human race, but rather the critical inquiry is whether Bennie O. Johnson, at the very date of such marriage, was of unsound mind thereby lacking sufficient mental capacity to contract a valid marriage; whether he as alleged in the complaint, was feeble-minded, was a common drunkard and afflicted with a contagious disease.

Examination of authorities discloses that there is no precise definition of the term "unsound mind", as employed by Section 14–0401, supra, and the difficulty of formulating a comprehensive definition long has been recognized. In a very early case,

Elzey v. Elzey, 1857, 1 Houst., Del., 308, the following language was used which is appropriate to the case at hand:

"It would be dangerous, perhaps, as well as difficult to prescribe the precise degree of mental vigor, soundness, and capacity essential to the validity of such engagement; which, after all, in many cases, depends more on sentiments of mutual esteem, attachment, and affection, which the weakest may feel as well as the strongest intellects, than on the exercise of a clear, unclouded reason, or sound judgment, or intelligent discernment and discrimination, and in which it differs in a very important respect from all other contracts."

While there has been a hesitancy on the part of the courts to judicially define the phrase "unsound mind," it is established that such term has reference to the mental capacity of the parties at the very moment of inception of the marriage contract. Ordinarily, lack of mental capacity, which renders a party incapable of entering into a valid marriage contract, must be such that it deprives him of the ability to understand the objects of marriage, its ensuing duties and undertakings, its responsibilities and relationship. There is a general agreement of the authorities that the terms "unsound mind" and "lack of mental capacity" carry greater import than eccentricity or mere weakness of mind or dullness of intellect. 28 A.L.R. 635 and cited authorities; 55 C.J.S. Marriage § 12, p. 824, and cited authorities; 35 Am.Jur., Marriage, Sections 17–18, page 189, et seq.

In 28 A.L.R. 635 we find an informative digest and compilation of authorities dealing with mental capacity to marry, wherein it is authoritatively stated that there is no " * * * general comprehensive test for determining the degree of mental capacity required to contract marriage * * * ", and this Court is of the opinion that the following criterion is the better rule:

"It seems that the best accepted test as to whether there is a mental capacity sufficient to contract a valid marriage, is whether there is a capacity to understand the nature of the contract and the duties and responsibilities which it creates." 28 A.L.R. 641; Dunphy v. Dunphy, 161 Cal. 380, 119 P. 512, 38 L.R.A.,N.S., 818; Kutch v. Kutch, 88 Neb. 114, 129 N.W. 169,

and such issue must be resolved by the ascertained and established facts in each case. In this connection an action for annulment is predicated upon, and pertinent inquiry must be directed to, some ground existing at the very time of the marriage, Kawabata v. Kawabata, 48 N.D. 1160, 189 N.W. 237; First National Bank in Grand Forks v. North Dakota Workmen's Compensation Bureau, supra, and the burden of proof is upon the party attacking the validity of the marriage to prove such ground by clear, convincing and satisfactory evidence.

The scope of trial inquiry is set forth in 2 Wigmore on Evidence, 3rd Edition, Section 233, as follows:

"Courts are today universally agreed that both prior and subsequent mental condition, within some limits, are receivable for consideration; stress being always properly laid on the truth that these conditions are merely evidential towards ascertaining the mental condition at the precise time of the act in issue. There seems to be no agreed definition of the limit of time which such prior or subsequent condition is to be considered, and in the nature of things no definition is possible. The circumstances of each case must furnish the varying criterion, and the determination of the trial judge ought to be allowed to control."

Evidence of previous or subsequent mental condition, whether opinion or other-

wise, is admissible only insofar as it may throw light on mental capacity at the precise moment of marriage.

Reference to the voluminous record of testimony of this trial, discloses that plaintiff called both expert and non-expert witnesses, all of whom testified with respect to mental capacity, or facts purportedly relating thereto.

The lay witnesses so testifying generally offered evidence that the plaintiff, early in 1955 and years prior thereto, was drinking intoxicating liquor heavily, was an alcoholic and was a common drunkard. That he was in prior years a man of intelligence whereas at the time of marriage he was unable to make decisions or understand the marriage contract. Their testimony was generalized and does not appear to have foundation in any particular acts or conduct indicating or characterizing an absence of such mental capacity on or near the date of marriage, but rather it appears that plaintiff in and about such date was the subject of a guardianship proceeding in which he actively participated and successfully opposed.

Much of the proffered expert professional testimony, in the presentation of plaintiff's case, was in the form of deposition testimony and merely expanded upon the report of the respective expert witness as considered by the County Court at the prior guardianship hearing of September 30, 1955, approximately two weeks after the marriage in question, which resulted in a determination that the plaintiff at that date was of sound mind, was competent to manage his own property and affairs, and that the appointment of a guardian was neither necessary nor convenient.

Such expert testimony and letter exhibits are contradictory, inconclusive and unsatisfactory. In this respect the following excerpts will be illustrative: One such professional expert by letter stated,

"On balance, I do not think he (the plaintiff) will, even with energetic treatment, reach a condition in which he can be considered competent to handle his own affairs.",

and in a subsequent letter stated,

"As you know, Mr. Johnson has known his fiancee for several years and his ardent desire to marry her is not an irresponsible whim."

Another expert testified in effect that plaintiff was not capable of entering into a marriage contract, and by letter stated,

"In thinking this case over, I believe I may have misunderstood the question of marriage. I should like to revise that statement of mine to indicate that I believe that Mr. Johnson could marry and he may well be a happier person being married. However, this, in my opinion, does not alter the other answers, namely that he cannot be considered competent to handle his financial affairs and that he needs a guardian."

Yet another expert medical witness testified that plaintiff was not competent to contract marriage as he was not employable and further basing his opinion somewhat on the conclusion that plaintiff could not be competent because of his entry into a private mental hospital.

At the time of trial, approximately two years after the marriage in question, the plaintiff was examined by a psychiatrist and a psychologist relative to plaintiff's mental competency at the date of marriage, the findings being,

"We feel that this individual is not competent from both a psychiatric and legal standpoint and do not feel that he was actually able to legally enter a marital contract in his second marriage, as it is our feeling that he was probably interpersonally psychotic at the time of the marriage."

Additional expert medical testimony of record reveals that further opinions were

rendered that plaintiff at the time of marriage was incompetent.

It is evident that the expert and non-expert testimony here was concerned with facts which the law does not recognize as bearing upon mental capacity to validly contract marriage, and that the professional opinion testimony was based in part upon facts not in evidence in the trial of this action. The probative value of the whole of such evidence is highly questionable because of remoteness, irrelevancy and hearsay. See Albrecht v. Albrecht, N.D., 92 N.W.2d 726; 32 C.J.S. Evidence § 569, p. 403. And such testimony has little or no weight as probative evidence upon the ultimate issues in the instant case.

There is no evidence that Bennie O. Johnson did not understand the nature of the marriage contract and the duties and responsibilities which it creates. That he was anxious to marry is indicated by the fact of talking about the contemplated marriage for about two years prior to the actual celebration thereof and he "always said that he was going to marry her if he dropped dead before the ceremony was over." Those persons who had business dealings with the plaintiff testified that he was able to discuss and arrange for his business of farming. On January 22, 1957, the plaintiff in his own right executed a warranty deed and trust indenture conveying his land to one of his now present attorneys and a nephew, a witness in this lawsuit. Mr. Nilles, who as his attorney, represented Mr. Johnson at the guardianship hearing of September 30, 1955, opposing appointment of a guardian for him, gave the following testimony:

"Q. And at these conferences that you have mentioned after September 16th, (1955) after September 19th, (1955), what would you say with respect to Bennie Johnson's conversation? Were his answers responsive to the questions? A. (By Mr. Nilles) They were, sir. And I will say this by way of explanation, that he was to testify at this hearing and I at that point, either the 28th or the 30th of September, I interrogated him, of course, quite closely in preparation for the matters that we were to present in Court, and his answers were as good as any other witness that I have had the pleasure of working with. He would answer up the information I wanted to develop on this hearing."

Mr. Nilles further testified that he received answers from Mr. Johnson that were intelligent enough so that proper preparation could be made for defense of the matter at hand, namely, the guardianship hearing of September 30, 1955.

The record also discloses that a religious factor was present in the questioned marriage and that prior to actual marriage the plaintiff discussed what effect, if any, such factor would have upon the affairs of the contemplated marriage. Further, prior to marriage, attempted conversations by relatives with Johnson in Norwegian, in the presence of his then fiancee, were objected to by him, he admonishing such relatives to speak "so she can understand", which gives credence to a full appreciation by him of her relationship to him and of the existing circumstances of the situation.

Section 27-0739 NDRC 1943 provides that,

"The proceedings of a county court in the exercise of its jurisdiction shall be construed in the same manner and with like intendments as the proceedings of courts of general jurisdiction, and its records, orders, and decrees there shall be accorded like force, effect, and legal presumptions as to the records, orders, judgments, and decrees of courts of general jurisdiction."

Exclusive original jurisdiction for appointment of guardian and the duties thereof is vested in the county court. Constitution of the State of North Dakota, § 111.

During the trial of the instant action, defendant's counsel moved that judicial notice be taken of the guardianship proceedings of September 30, 1955, which resulted in the issuance of an order of the county court finding and determining sound mind and mental competency on the part of Johnson two weeks subsequent to the questioned marriage. Such order as duly issued by the county court in the exercise of its jurisdiction is entitled and accorded full recognition in view of Section 27-0739, supra. While such order is not res judicata nor a conclusive adjudication of plaintiff's mental capacity at the very time of prior actual marriage, nevertheless, such order was properly admissible for consideration as probative evidence of such mental capacity at the time in question, to be considered with all other evidence of the case. 28 A.L.R. 635, 649; Johnson v. Johnson, 214 Minn. 462, 8 N.W.2d 620; See McAllister v. Rowland, 124 Minn. 27, 144 N.W. 412, overruling In re Pinney's Will, 27 Minn. 280, 6 N.W. 791, 7 N.W. 144; In re Van Houten's Will, 147 Iowa 726, 124 N.W. 886.

The order of the county court is not conclusive as to the plaintiff's mental capacity. Tests judicially applied for a determination of incompetency in guardianship matters differ markedly from those applied for the determination of mental capacity to contract a marriage.

It frequently has been held in other jurisdictions, that a person even though under guardianship as an incompetent may have in fact sufficient mental capacity to validly contract marriage. Johnson v. Johnson, 214 Minn. 462, 8 N.W.2d 620; Reeves v. Hunter, 185 Iowa 958, 171 N.W. 567; McGuire v. Moorhead, 151 Iowa 25, 130 N.W. 140; 28 A.L.R. 635, 649; Roether v. Roether, 180 Wis. 24, 191 N.W. 576, 28 A.L.R. 631.

What has been said distinguishes the instant case from Westerland v. First National Bank, 38 N.D. 24, 164 N.W. 323, 7 A.L.R. 562, the latter case holding that an inquisition finding of insanity is inadmissible in a civil action as evidence of insanity as a defense to such civil action, as such insanity board commissioners do not act in a judicial capacity and their finding is not judicial in basis. In that respect also is the present action distinguished from State ex rel. Sathre v. Roberts, 67 N.D. 92, 269 N.W. 913, 921, 108 A.L.R. 37, where it was held that the "finding of the commissioners of insanity was not a judicial determination * * *".

After a careful consideration and review of the entire record, we conclude that the ascertained and established evidence falls far short of proving a lack of requisite mental capacity to contract a valid marriage at the date thereof on the part of Bennie O. Johnson. The evidence however, does affirmatively establish that Bennie O. Johnson at the date of the marriage in question did possess sufficient mental capacity to validly contract such marriage, and that the marriage is not prohibited by any laws of this state.

It is further argued that defendant caused the plaintiff to make out a false application for a Minnesota marriage license and that marriage pursuant to such license is invalid. This contention cannot be sustained.

Section 14–0308 NDRC 1943 provides,

"All marriages contracted outside of this state, which are valid according to the laws of the state or country where contracted, shall be valid in this state. This section shall not apply when residents of this state contract a marriage in another state which is prohibited under the laws of North Dakota."

We have heretofore held that the marriage in question in this action is not prohibited by the laws of North Dakota. Accordingly, if such marriage is valid under the laws of the State of Minnesota, then such marriage is recognized as valid in this

state. It is apparent that Minnesota adheres to the generally accepted rule that validity of a marriage is not affected by the fact that the marriage license was obtained by fraud or perjury. See In re Kinkead's Estate, 239 Minn. 27, 57 N.W.2d 628. The questioned marriage being valid in the State of Minnesota is accorded full recognition in the State of North Dakota.

This court has often held that upon trial de novo in this court, that the findings of the trial court, who sees and hears the witnesses as they testify, are entitled to appreciable weight by this court in considering the record as it comes to us for trial de novo. State for Benefit of Workmen's Compensation Fund v. City of Williston, 72 N.D. 486, 8 N.W.2d 564; Sinerius v. Anderson, 73 N.D. 269, 14 N.W.2d 230; Nord v. Nord, 68 N.D. 560, 282 N.W. 507; Belt v. Belt, 75 N.D. 723, 32 N.W.2d 674. And such has been done in the instant case, but such findings by the trial court are not conclusive and this court is not bound by such findings and if they are not well sustained by the evidence, this court is duty bound to reverse or modify the judgment as the record may warrant. Verry v. Yuly, 73 N.D. 346, 15 N.W.2d 210; Ellison v. Ellison, 79 N.D. 46, 54 N.W.2d 656; Moore v. Lium, N.D., 80 N.W.2d 657.

Upon the entire record, the judgment of the District Court granting and decreeing unto plaintiff an annulment of marriage must be in all things reversed.

The judgment is reversed and the case remanded with directions to enter a judgment in favor of the defendant for dismissal of the action.

SATHRE, C. J., and MORRIS, BURKE and TEIGEN, JJ., concur.

STRUTZ, J., deeming himself disqualified, did not participate, Honorable DOUGLAS B. HEEN, one of the Judges of the Second Judicial District, sitting in his stead.