VICTOR GAHWILLER, Appellee, v. WALTER EDWARD GAHWILLER, Appellant.

No. 46945.

1292

Edson & Edson, of Storm Lake, for appellant.

Robert A. Currie, County Attorney, for appellee.

HALE, J.—The Sac County Commissioners of Insanity, on July 9, 1945, ordered the appellant, Walter Edward Gahwiller, to be committed to the Hospital for the Insane at Cherokee. The appellant was an unmarried man sixty-two years of age. His father died about 1927, survived by his widow and three children: the appellant, Walter Edward Gahwiller; a younger son, Victor; and a daughter living in Virginia. In 1943 the mother, Elizabeth, died and Walter Edward Gahwiller, appellant, was appointed administrator of her estate. Some difficulty arose over the purchase of the home by Walter Edward. He wanted to buy the shares of his brother and sister in the home property, the value of which was fixed at $1,200. An oral agreement was entered into and apparently an arrangement was made for Victor and the sister to sell their one-third interests to Walter for $400 each. After deducting attorney's fees and costs appellant left his checks for his brother and for his sister in the bank, but the brother delayed before completing the agreement. Appellant received a deed from the sister for her interest, but Victor continued to delay, accepting the check during January 1946. This was a source of the difficulty between the brothers and brought about the hearing on the information of insanity which was filed by the brother, Victor.

In the examination by the physician member of the commission his report shows there was a finding of mental derangement now manifested "persecution"; a disposition to injure others; and epilepsy. At the time of the examination and hearing appellant weighed about one hundred twenty-five

pounds, by occupation was a painter, and was bent and crippled. The brother, Victor, was a much larger man, and the brothers had worked together at different times during the past years. The commissioners found appellant insane and a fit subject for custody and treatment at the hospital for the insane.

After this finding by the commission appellant was taken to the state hospital at Cherokee on the day of the hearing, July 9, 1945. Appellant appealed to the district court. On the 14th of July the Commissioners of Insanity of Sac County entered an order stating that the appellant could not, with safety, be allowed to go at large, and ordered that during the pendency of the appeal he be placed in the custody of C. R. Gaffin, sheriff of Buena Vista County, Iowa, and authorized the superintendent of the State Hospital for Insane to turn over the custody of appellant to said sheriff during the pendency of the appeal. Appellant was released from the hospital to the care and custody of the sheriff on November 9, 1945, and the appeal came on for hearing before the district court on March 24, 1946.

Appellant filed an extended pleading by way of answer; alleges the facts as to his commitment as we have stated, asserts that he was given no opportunity to appear on his own behalf or to employ an attorney or make any defense as to the complaint before the commission, and alleges that he was not informed as to what the complaint was; that at the hospital they placed him in a ward for violent patients and he remained there for some time before he was removed to another ward. He sets out the fact of his release to the custody of Sheriff Gaffin on the 9th of November; that he resided at one of the cottages at the Casino at Storm Lake, and his return in December to his home in Schaller; denies his insanity and denies that he ever harmed any person; alleges that he has not been kept in custody by the sheriff, and since his release he has taken care of his property and his business, paid his taxes, and has been a law-abiding citizen; alleges that he is in good health, has had a great deal of work to do in caring for his property, consisting of a residence property at Schaller, now rented, and three cottages at the Casino, and that it is necessary he be allowed to look after his business and care for his property; that he acquired the third interest of his brother in the property at Schaller since his release from

the hospital. He refers to the probate proceedings in his mother's estate and asks a decree finding him not insane and for his final release and discharge.

At the trial of the appeal in the district court the testimony, as frequently occurs in such cases, varied greatly and was contradictory. The judge, in his written opinion, reviewed with care the evidence introduced. While there is other testimony not referred to, a comparison of the court's finding with the record shows that it properly summarizes the evidence in the appeal. It finds that, except for one instance about eighteen years previously, when the appellant was said to have choked his brother, the record discloses no particular trouble between appellant and his brother before this difficulty over the property arose. The court said that appellant's claim is that their "trouble was all over the property" and the court finds that there was trouble during the period from about November 1944 to July 1945, when the finding of the commission was made.

Quoting from the court's opinion as to the facts before it:

"Early in that period he told Mrs. Markley, at whose home he was working that he was going to 'duel it out' with his brother, and a little later he did challenge his brother to fight with knives, guns or other weapons. In the summer of 1945, he said to Mr. Schlotfelt, while he was working at the Schlotfelt home, and later to Mr. Struble, Mr. Lynch and Mr. Miller, that he was going to kill his brother, and his brother's wife, and then kill himself to beat the law. A little later, when he was working in a patch of raspberries, he got into an argument with his brother and his brother's wife about the raspberries, and said, among other things he would kill them both and then himself; that he would see them in hell before they got any of that property. On July 4, 1945, a neighbor, Mrs. Dick, heard the appellant threaten his brother. She does not know what was said, but she says that the appellant seemed 'all mixed up.'. On one occasion the appellant told Mr. Schlotfelt that if his brother didn't do as he wanted him to, he would use the gun on him. The appellant had as many as five guns. At another time the appellant told Mr. Struble that his brother thought that he was going to get his (appellant's) property, but that he wouldn't and that when he went he would take his brother with him.

"The appellant also threatened a neighbor, Mrs. Edwards, on the occasion of her driving appellant's chickens out of her yard. This had no relation to the trouble over the real estate. He swore at, and verbally abused Mrs. Edwards, told her that he hated her, that she was driving out his chickens to be smart, and that he had guns and would use them. Afterwards he complained of Mrs. Edwards to Mr. Schlotfelt; complained that she felt above other people although the Edwards had nothing when they came to Schaller, and, referring to her chasing of his chickens, said that if she didn't keep her place he would get her.

"The foregoing, I think are the matters principally relied upon by the informant to establish the appellant's insanity.

"The appellant has been afflicted with epilepsy for some years, and has occasionally had seizures, or 'fits,' during which he has been unconscious for a short time. Within a few minutes after one of these seizures he is able to go on his way.

"In August 1944, he sustained injuries in an automobile accident and was in the hospital for several days. His injuries, according to Dr. Swallum, who attended him, were not such as affect his mentality.

"The appellant's brother's wife, says that the appellant is given to repeating things over, and that he does this most of the time.

"Except for the one instance 18 years ago when he is said to have choked his brother, he has never inflicted physical violence on anyone.

"No one complains of any conduct on his part since he left the hospital.

"The appellant has been engaged in painting at Schaller, and vicinity, for about 46 years. He owns the home place, and another house, in Schaller, and three cottages at the resort on Storm Lake, besides some personal property. He has some money in both of the Schaller banks, and some in one of the banks in the city of Storm Lake. His business transactions with the bankers have been satisfactory and businesslike."

The court further states that one of the medical men who testified was of the opinion that his threats to kill did not indicate insanity. Another thought that, while these threats did

not prove insanity, they were enough to raise a suspicion of insanity; and another thought that, while they did not prove insanity, they were enough to suggest the desirability of further observation and study of the appellant. The court also found that the most any of the lay witnesses say is that the appellant is insane at times, or when he is in a rage, and that he is sane at other times. On all the evidence, as thus summarized, the court found that the "appellant is afflicted with insanity within the meaning of the statute, which includes in the term every species of insanity or mental derangement."

The court, as a conclusion of law, ordered that the appellant should be committed to the state hospital for custody and treatment until he should be legally discharged. From this finding and order defendant appeals.

I. The propositions relied upon by appellant for reversal are: (1) that the making of a threat by one man to kill another is not sufficient to prove that the one making the threat is insane and the preponderance of the evidence is in favor of appellant (2) the burden of proof is upon complainant under the general rule of the presumption of sanity (3) that there is no evidence of delusions (4) in substance, what is relied upon in appellant's contention number 1 (5) appellant objects to the statement in the finding of the court as to the calmness with which appellant at times made these threats and (6) that the evidence is insufficient.

II. As to division 2 of appellant's propositions we may assume, without necessarily holding, that the contention is correct, but hold that the burden has been sustained.

As to delusions, set out in division 3, defendant cites no authority, nor do we understand that proof of delusions is, in all cases, necessary to establish insanity. Even so, the report of the physician plainly indicates a "derangement,"—of persecution. Delusional insanity is only one of various forms of insanity. 32 C. J. 600, section 15; 44 C. J. S. 9, section 2, b (1).

In division 5 the appellant contends that the court was in error in finding that the appellant, in relating to others what he planned to do, was not in a passion or excited. We think that, as a matter of fact, the court was warranted in so finding, and that the threats in various instances were calmly made.

The remaining propositions relate to the proof. In substance they may be considered as one, that is, "That the evidence is wholly insufficient to establish the insanity of the appellant."

III. The argument of the appellant is largely·devoted to his claim that the facts do not warrant the finding. He cites, in support of his contention, our more recent cases of Kovar v. Kovar, 237 Iowa 251, 21 N. W. 2d 534; Neidermyer v. Neidermyer, 237 Iowa 685, 22 N. W. 2d 346; Madsen v. Obermann, 237 Iowa 461, 22 N. W. 2d 350. In none of these cases are the facts similar to the case at bar. Appellant also cites various other cases unnecessary to enumerate. Nearly all the cases cited differ in nature from the present one. They relate to false imprisonment, wills, actions to set aside a deed, guardianship, libel, habeas corpus, defense of insanity in criminal trial etc., but more especially guardianship. None has application here. The only question in this proceeding is whether or not the appellant is insane and should be committed to the state hospital. Nearly all of the cases cited were ordinary civil actions. This is a special action. See section 611.2, Code of 1946 (section 10939, Code of 1939) :

"A civil action is a proceeding in a court of justice in which one party, known as the plaintiff, demands against another party, known as the defendant, the enforcement or protection of a private right, or the prevention or redress of a private wrong. It may also be brought for the recovery of a penalty or forfeiture.

"Every other proceeding in a civil case is a special action."

Section 611.4, Code of 1946 (section 10941, Code of 1939), provides that:

"The plaintiff may prosecute his action by equitable proceedings in all cases where courts of equity, before the adoption of this code, had jurisdiction, and must so proceed in all cases where such jurisdiction was exclusive."

Section 611.6, Code of 1946 (section 10943, Code of 1939), provides:

"Ordinary proceedings. In all other cases, unless otherwise provided, the plaintiff must prosecute his action by ordinary proceedings."

As to special actions the provisions of the Code are:

"Uniformity of procedure. The provisions of this code concerning the prosecution of a civil action apply to both ordinary and equitable proceedings unless the contrary appears, and shall be followed in special actions not otherwise regulated, so far as applicable." Code of 1946, section 611.13 (Code of 1939, section 10950).

This section has been applied in various cases. See Forney & Thayer v. Ralls & Willits, 30 Iowa 559; Whitney v. Atlantic Southern Ry. Co., 53 Iowa 651, 6 N. W. 32; State v. Clarke, 46 Iowa 155; State v. Mosher, 128 Iowa 82, 90, 103 N. W. 105, 5 Ann. Cas. 984.

In the case of In re Brewer, 224 Iowa 773, 276 N. W. 766, we held that this kind of proceeding, on appeal to the district court from a finding of the commissioners of insanity, was a special proceeding and not triable to a jury. (Citing cases.) The distinction between a direct proceeding to determine the sanity or insanity of a defendant is different from a proceeding in guardianship, the questions to be determined in each case not being of the same nature.

In the annotation to In re Petition of Masters, 216 Minn. 553, 13 N. W. 2d 487, found in 158 A. L. R. 1210, 1220, the distinction is stated:

"It may be observed that lunacy statutes are frequently of two general types, those which provide procedure for the general purpose of having a person declared insane and confined * * * and those which provide for the appointment of a guardian or committee of the estate and person of insane persons." Citing Baum v. Greenwald, 95 Miss. 765, 49 So. 836, as to such distinction.

The editorial note proceeds:

"There the court observed that the former type of statute was in the nature of a police regulation designed for the pro-

tection of the public and of the insane person, and that the latter type was designed solely for the purpose of protecting the estate and person of the insane person.''

Such has been the holding in our own court.

The case of McKinstry v. Dewey, 192 Iowa 753, 756, 185 N. W. 565, 566, 23 A. L. R. 587, 589, relates to the necessity of notice before appointment of a temporary guardian, but the opinion refers to the difference between the two classes of cases in the following language:

''This proceeding is not to be confused with proceedings for the commitment of an insane person to the hospital for the insane. That is an altogether different matter, and the method to be pursued and the remedy sought are altogether different from those in a proceeding for the appointment of a guardian. We have held that the investigation into the question of insanity before the board of commissioners of insanity may be had without notice to the person suspected of being insane.'' Citing cases.

See, also, as to the difference between these types of cases, State ex rel. Sathre v. Roberts, 67 N. D. 92, 269 N. W. 913, 108 A. L. R. 37, citing the McKinstry case, supra.

IV. The question involved in this case is one of fact. The examination of the witnesses was extensive and there were no objections in the record to the introduction of any of the testimony. Apparently a complete inquiry was made as to the condition of the appellant so that the exceptions to the ruling of the court resolve themselves into a question of the sufficiency of the evidence.

As stated, this is a special proceeding. It was tried to the court without the intervention of a jury. See In re Brewer, supra. It is neither a criminal action nor an action in equity. It is not triable de novo here, since there is no provision in the statute to that effect. The cases cited by the parties cite three cases in our reports where the appeal was solely upon the question of insanity and commitment.

In re Harmsen, 1918, not reported in the Iowa reports, but found in 167 N. W. 618, was apparently a trial to the court, but the only question raised was as to the competency of certain

witnesses. In re Insanity of Fleming, 196 Iowa 639, 195 N. W. 242, while a case of the same kind as the one at bar, refers only to the competency of physicians to testify, and instruction on nonexpert opinions. In re Brewer, supra, as we have stated, related to trial by the court. Our most recent case, State ex rel. McPherson v. Rakey, 1945, 236 Iowa 876, 20 N. W. 2d 43, though not an insanity adjudication, was an appeal from a finding of feeble-mindedness, but was similar in some respects to the case at bar. The issue in that case was the contention that there was no right of appeal.

The appeal of the Rakey case to this court was tried as in equity, but the opinion points out and refers to section 3422, Code of 1939 (section 222.12, Code of 1946), which provides:

"Answers need not be, but may be, filed. The hearing on the allegations of the petition shall be as in equitable proceedings."

In various places the opinion repeats the phrase "as in equity," but no such provision as to trial appears in the insanity statute, chapter 177, Code of 1939 (chapter 229, Code of 1946). There being no such provision in the chapter we are considering, and the proceedings being neither equitable nor criminal, the case is prosecuted by ordinary proceedings. In such case the ruling of the court has the force and effect of a verdict of a jury, and, there being sufficient competent evidence herein to warrant the court's conclusion, the finding and order of the court should be sustained.

In cases of this character we scrutinize with care the facts which are the basis of the opinion of the lower court and we have so done in this case. On an examination of the record we hold that the decision of the lower court finds support therein. The case is therefore affirmed.—Affirmed.

GARFIELD, C. J., and SMITH, MANTZ, MULRONEY, HAYS, and WENNERSTRUM, JJ., concur.