In the Matter of Vert OSEING, Alleged to be seriously mentally impaired.

Appeal of Vert OSEING.

No. 64316.

Supreme Court of Iowa.

Sept. 17, 1980.

Lynn Fillenwarth and Julie Fillenwarth of Fillenwarth & Fillenwarth, Estherville, for appellant.

Thomas J. Miller, Atty. Gen., Thomas Mann, Jr., Asst. Atty. Gen., and Kendall Surfass, Asst. County Atty., Estherville, for the State.

Considered by REYNOLDSON, C. J., and LeGRAND, HARRIS, McCORMICK and LARSON, JJ.

McCORMICK, Justice.

In this case of first impression, we must determine the elements of proof of serious mental impairment justifying involuntary hospitalization of mentally ill persons, the nature of our review of a commitment order, and the sufficiency of evidence to support commitment in the present situation. We find no reversible error and therefore affirm the trial court.

The history and present status of civil commitment of the mentally ill in Iowa has been traced in a number of writings. In chronological order, they include: Note, *Incarceration of the Mentally Ill in Iowa*, 33 Iowa L. Rev. 390 (1948); Note, *Procedural Aspects of Commitment of the Mentally Ill in Iowa*, 35 Iowa L.Rev. 270 (1950); Contemporary Studies Project: *Facts and Fallacies About Iowa Civil Commitment*, 55 Iowa L.Rev. 895 (1970); Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa: The 1975 Legislation*, 61 Iowa L.Rev. 261 (1975); Note, *Due Process Deficiencies in Iowa's Civil Commitment Procedure*, 64 Iowa L.Rev. 65 (1978); Contemporary Studies Project: *Involuntary Hospitalization in Iowa: The Failure of the 1975 Legislation*, 64 Iowa L.Rev. 1284 (1979).

In 1975 the legislature adopted a comprehensive revision of civil commitment procedures. *See* 1975 Session, 66th G.A., ch. 139. This is our present statute, chapter 229, The Code. The statute reflects a change in approach to the involuntary hospitalization of the mentally ill. Involuntary commitment deprives an individual of his liberty through coercive state action, and the statute imposes stringent substantive and procedural limitations on the exercise of the State's power. In so doing, it responds to a national concern about the deprivations endured by civilly committed persons. *See, generally*, Developments in the Law: *Civil Commitment of the Mentally Ill*, 87 Harv.L. Rev. 1190 (1974).

The present case involves Vert Oseing, a 29–year–old man with a history of commitments for mental illness. His illness has been diagnosed as schizophrenia, paranoid type. Prior to the present case, he was committed for treatment on nine occasions, starting in 1968. Only one of those commitments was voluntary.

This action was initiated on September 20, 1979, by his mother, Marion Evenson, who filed an application seeking Vert's involuntary hospitalization pursuant to section 229.6. He was removed from his job and immediately confined in the Mental

Health Institute at Cherokee. *See* § 229.11. A commitment hearing was held by a referee on September 24, resulting in an order of commitment. *See* §§ 229.11, .12, .21. Vert appealed to a judge of the district court as provided in section 229.21(4). After a de novo trial pursuant to section 229.21(4), Vert was again ordered committed. This appeal is from that order. *See* § 229.17.

I. *The elements of serious mental impairment.* Proceedings for involuntary hospitalization may be commenced by the filing by "any interested person" of a verified application, accompanied by required supporting data, which alleges as a basis for commitment that the respondent is "seriously mentally impaired." § 229.6. This ground is defined in section 229.1(2):

"Seriously mentally impaired" or "serious mental impairment" describes the condition of a person who is afflicted with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to his or her hospitilization or treatment, and who:

a. Is likely to physically injure himself or herself or others if allowed to remain at liberty without treatment; or

b. Is likely to inflict serious emotional injury on members of his or her family or others who lack reasonable opportunity to avoid contact with the afflicted person if the afflicted person is allowed to remain at liberty without treatment.

"Mental illness" is defined in section 229.1(1) and "serious emotional injury" is defined in section 229.1(3).

■ Commitment is not warranted unless the elements of serious mental impairment are proven by clear and convincing evidence. § 229.12(3); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

The definition of serious mental impairment contains three express elements. The respondent must be found to be (1) "afflicted with a mental illness," consequently (2) to lack "sufficient judgment to make responsible decisions with respect to his or her hospitalization or treatment," and (3) to be

likely, if allowed to remain at liberty, to inflict physical injury on himself or others or to inflict emotional injury on the designated class of persons.

The parties agree these elements must be established, but they disagree about whether a fourth element is required by implication. Vert contends the State must also prove the mental illness is amenable to treatment. The State argues otherwise.

Vert's contention is supported by the language in the definition of serious mental impairment which requires a finding that the respondent is likely to inflict physical or emotional injury "if allowed to remain at liberty *without treatment.*" (emphasis supplied). *See* § 229.1(2)(a), (b). However, the statute presupposes that some seriously mentally impaired persons must be placed in full–time custody and care even though they are not amenable to treatment. Section 229.14(4) requires the chief medical officer of the hospital to recommend to the court an alternative placement for such persons.

If carried to its logical extreme, Vert's contention would result in a situation where persons with untreatable mental illness could not be involuntarily committed regardless of the risk they pose to themselves or others. Detention of those persons presumably could occur only after their conviction of a felony. *See* chapter 812, The Code.

■ In interpreting chapter 229, we are guided by familiar principles. *See Doe v. Ray,* 251 N.W.2d 496, 500–01 (Iowa 1977). Applying them here, we do not believe the legislature intended amenability to treatment to be an element in the State's proof. Rather, it is an issue to be addressed in the report of the chief medical officer. That report must be made within fifteen days after the person's hospitalization based upon the complete psychiatric evaluation required by section 229.13. At that point section 229.14(4) comes into play. If the illness is not treatable, an alternative placement may be ordered pursuant to that provision. If the statute did not operate in

this manner, it would include no basis for initial involuntary commitment of dangerous persons not amenable to treatment. Yet it would include a basis for transferring such persons from a hospital to an alternative placement after fifteen days. We do not believe the legislature intended this anomaly. Nor do we believe the legislature intended that untreatable dangerously mentally ill persons must remain at large. We hold that amenability to treatment is relevant on the issue of continued hospitalization but not an element which must be proved in advance of initial commitment.

■ II. *The nature of our review.* An involuntary commitment proceeding is a special action which is triable to the court. *See In re Brewer*, 224 Iowa 773, 777, 276 N.W. 766, 768 (1937); § 611.2, The Code. The nature of our review depends upon whether it is triable as an ordinary or equitable proceeding. Special actions are tried as ordinary actions at law unless made triable in equity by statute or pursuant to section 611.4. Chapter 229 has no provision making the action triable in equity. The provision in section 229.21(4) for trial de novo in district court of an appeal from a referee's commitment order does not make the proceeding equitable. It merely substitutes the de novo trial for the former statutory right to trial by jury. *See In re Brewer*, 224 Iowa at 778, 276 N.W. at 768.

Therefore we must determine whether the proceeding comes within section 611.4. It provides:

The plaintiff may prosecute his action by equitable proceedings in all cases where courts of equity, before the adoption of this Code, had jurisdiction, and must so proceed in all cases where such jurisdiction was exclusive.

The decisive issue is whether courts of equity, before adoption of the Code, had jurisdiction over involuntary civil commitment proceedings.

This issue was addressed in *Gahwiller v. Gahwiller*, 237 Iowa 1291, 25 N.W.2d 485 (1946), where the court held that the proceeding is a special action which was not historically triable in equity. The court said: "It is neither a criminal action nor an action in equity. It is not triable de novo here, since there is no provision in the statute to that effect." *Id.* at 1299, 25 N.W.2d at 489.

History shows that commitment proceedings originated from the concept of parens patriae in the English constitutional system. The sovereign was the general guardian of the insane. This responsibility of the King was part of his "royal prerogative." "In the United States, the 'royal prerogative' and the 'parens patriae' function of the King passed to the States." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257, 92 S.Ct. 885, 888, 31 L.Ed.2d 184, 189 (1972).

In the English system, the King delegated authority to his chancellor "to issue a writ or commission to inquire as to the fact of idiocy or lunacy and the method of procedure was by petition suggesting the lunacy." *Hughes v. Jones*, 116 N.Y. 67, 75, 22 N.E. 446, 448 (1889). The power belonged to the chancellor rather than the chancery court. 4 Pomeroy's Equity Jurisprudence § 1311 at 883 (5th ed.1941). The chancery court had jurisdiction over infants but not lunacy proceedings. *See* 3 Story's Equity Jurisprudence § 1750 at 366–67 (15th ed. 1918) ("The jurisdiction over idiots and lunatics . . . is a personal trust in the Lord Chancellor, and especially delegated to him under the sign manual of the King; and from his decree no appeal lies except to the King in council."). The chancellor convened a commission to conduct the lunacy inquiry with the assistance of a jury. 4 Pomeroy's Equity Jurisprudence § 1312 at 884–85. However, because the proceeding was not within the jurisdiction of the chancery court, "[i]t necessarily follows from its origin that this special jurisdiction over the persons and property of lunatics is not generally possessed by courts of equity in the United States as part of the original inherent equitable jurisdiction." *Id.* § 1313 at 885–86.

■ Because an involuntary civil commitment proceeding is not triable in equity by statute or under section 611.4, it is triable

as an ordinary action at law. *See* § 611.6, The Code. Therefore our review is not de novo. The trial court's findings of fact have the effect of a special verdict. Iowa R. App. P. 4. The substantial evidence test governs review of trial court findings of fact. *See Eldridge v. Herman*, 291 N.W.2d 319, 321 (Iowa 1980).

III. *Sufficiency of the evidence.* Vert challenges the sufficiency of evidence on two elements of the allegation of serious mental impairment. He does not dispute the finding of mental illness but contends the remaining elements were not proven. We must therefore examine the evidence on those elements in the light of the substantial evidence test. Because we have held amenability to treatment is not a required element in the State's proof, we do not address his challenge to the proof on that issue.

A. *Judgmental capacity.* The trial court found Vert lacked "sufficient judgment to make responsible decisions with respect to his . . . hospitalization or treatment." *See* § 229.1(2). This element requires the State to prove "that the person is unable, because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not." Bezanson, *supra*, at 275.

Vert testified he was not ill and did not need any treatment. Dr. Joseph Goss, psychiatrist and chief of the adult male unit at Cherokee, testified that paranoid schizophrenics usually deny they are ill. He said Vert's illness was more intense with each hospitalization. He did not believe Vert was capable of making a responsible decision about the need for treatment. Dr. Goss and other witnesses testified that Vert was having disturbing visual and auditory hallucinations. Upon this record, the trial court could reasonably find Vert lacked capacity to make a rational judgment about treatment.

B. *Dangerousness.* The dangerousness element has two alternative bases. One is proof that the person is likely to inflict physical injury "[on] himself or herself or others if allowed to remain at liberty without treatment." § 229.1(2)(a). The other basis is proof that the person is "likely to inflict serious emotional injury on members of his or her family or others who lack reasonable opportunity to avoid contact with the afflicted person if the afflicted person is allowed to remain at liberty without treatment." § 229.1(2)(b).

In the present case, the trial court found the first ground was proven but the second was not. Because we cannot say as a matter of law that the second ground was established, we are bound by the court's finding on that point. Our inquiry therefore is whether substantial evidence supports the court's finding that the first ground was proven.

■ The parties disagree about the meaning of the word "likely." The State argues it means "substantial risk." Vert asserts it means "probable or reasonably to be expected." We believe the meaning advocated by Vert accords with the context and was intended by the legislature. *See* § 4.1(2), The Code; *Vohs v. A. E. Shorthill & Co.*, 130 Iowa 538, 543, 107 N.W. 417, 419 (1906). This element requires a predictive judgment, "based on prior manifestations but nevertheless ultimately grounded on future rather than past danger." Bezanson, *supra*, at 304.

■ Vert's past overt acts of violence included one incident in which he pulled his mother's hair and yanked a strip of wood off the living room wall in her home. Another time he started ripping plywood off the walls in his room. On a third occasion he put his fist through a bathroom wall. He also kicked a kitchen cabinet door hard enough to spring it and tore the shelves off the interior of the refrigerator door. His mother said she was afraid of him because of his frequent violent outbursts of temper.

Evidence was received, although denied by him, that he told his mother that he should kill two acquaintances and then himself. His mother said he told her, "I ought to kill them; they are bothering me." She also said he asserted voices told him it was all right to do so. She testified he threat-

ened to get a high–powered rifle and shoot up the county attorney's house.

Vert acknowledged having visions and hearing annoying voices saying such things as "Now I can kill him," "I am going to kill him," or "We are going to shoot him." He referred to these experiences as "perpetrations" which he sought to defend against. He said he called the D.C.I., county attorney, and governor's office seeking help but to no avail.

Dr. Goss testified Vert told him some of the same things. He said that Vert's visual and auditory hallucinations are typical of paranoid schizophrenics. He also said Vert believed a group was conspiring to kill him and a definite possibility existed that Vert would carry out his threats against the persons he believed were part of the conspiracy.

Vert said he would kill or injure others only in defending himself or family members.

We do not believe it is determinative that the psychiatric testimony was framed only in terms of a definite possibility as opposed to likelihood. The testimony was not couched in legal terms and must be weighed in context. Furthermore, it was only one aspect of the evidence on the issue of Vert's dangerousness. The trial court was entitled to consider all of the evidence and was not limited by Dr. Goss's opinion.

The evidence is substantial when Vert's paranoid delusion about a conspiracy against him is considered with evidence of his threats to kill the conspirators, his outbursts of temper resulting in the assault on his mother and damage to property, the medical evidence regarding predictable behavior of schizophrenics, his deteriorating condition, and his stated determination to defend himself and his relatives by killing or injuring others if he believed it was necessary. The court could reasonably conclude from the evidence that Vert's delusions would be likely to cause him to make an irrational decision concerning the necessity of acting defensively.

We hold that the evidence was sufficient to support the trial court's finding of dangerousness.

We find no merit in Vert's assignments of error.

AFFIRMED.