**IN THE COURT OF APPEALS OF IOWA**

No. 14-0096
Filed July 16, 2014

**IN RE THE MATTER OF S.L.,**
**Alleged to Be Seriously**
**Mentally Impaired,**

**S.L.,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Mary E. Howes, Judge.


A person who has been involuntarily hospitalized appeals the district court's decision to continue her placement. **AFFIRMED.**


Patricia A. Rolfstad, Davenport, for appellant.

Thomas J. Miller, Attorney General, Gretchen Witte Kraemer, Assistant Attorney General, Michael J. Walton, County Attorney, and Robert Cusack, Assistant County Attorney, for appellee.


Considered by Vogel, P.J., and Doyle and Mullins, JJ.

**MULLINS, J.**

S.L. appeals the district court's decision affirming the hospitalization referee's decision to continue her placement in a residential care center. She asserts on appeal the court erred in finding clear and convincing evidence she was a danger to herself or others and erred in not finding there was a less restrictive placement. Because we find sufficient evidence to support the district court's decision, we affirm the placement decision.

## I.  Background Facts and Proceedings.

S.L. was hospitalized in November of 2012 following her diagnosis of schizoaffective disorder with acute psychosis. S.L. had assaulted a police officer who had come to her apartment. She had been isolating herself and denying access to those who were concerned for her safety. She had delusional thinking and was paranoid, especially about food. The hospitalization referee found she had impaired judgment and little insight into her condition, she was refusing medication, and she was resistive to treatment. Because of her resistance to treatment and refusal to take medication, outpatient treatment was not an option, and she was hospitalized to stabilize her condition. In December 2012, pursuant to a doctor's report, S.L. was released to outpatient treatment.

However, in February 2013 she was again hospitalized after she refused to take her medication. The hospitalization referee found S.L. was resistive to taking her medication and was not successful at outpatient treatment. She was transferred in March of 2013 to the Mental Health Institute (MHI) for long-term inpatient care. The doctor's report following her transfer indicated she continued

to remain paranoid and very suspicious. She claimed her family was out to get her because she had an estate worth millions of dollars. She claimed the family was interested in killing her so they can get money from the estate. The report noted she was incapable of independent living.

In April of 2013, MHI reported S.L. had reached maximum benefits of hospitalization and asked for her to be transferred to Penn Center[1] for supervision and care as she was still in need of full-time custody but unlikely to benefit from further hospitalization. The court ordered the transfer in May of 2013. The treating physician at Penn Center reported in October of 2013 that S.L.'s condition remained unchanged and she needed the present level of care to maintain safety and medication compliance. The court thereby ordered continued custodial care.

In November 2013, S.L. requested a placement hearing pursuant to Iowa Code section 229.14A (2013). The hospitalization referee subsequently entered an order following a hearing, which stated S.L. had poor insight into her illness and does not feel she needs medication. The referee noted the doctor testified that if S.L. left the facility the doctor believed she would stop taking her medication. The doctor stated that if S.L. would take an injectable form of medication for approximately three months, S.L. may be able to leave Penn Center and live independently. The court continued the placement at Penn Center, concluding that this placement provided the best treatment option for

---

[1] Penn Center is a residential care center with twenty-four hour supervision. Nurses dispense medication. Daily activities are provided.

S.L.'s mental health problems and outpatient treatment was not an option due to her medication compliance problems.

S.L. appealed this decision to the district court. After a de novo hearing during which the court took the telephone testimony of the treating physician and heard testimony from S.L.'s son, the court affirmed the placement order in December 2013. She has appealed, claiming there is no evidence to support that she is a danger to herself or others and that there is a less restrictive placement option.

## II. Scope and Standard of Review.

Our review of the district court's decision in commitment cases is for errors at law. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). The court's findings of fact are binding on us if supported by substantial evidence. *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). "In a placement hearing, the court shall determine a placement for the respondent in accordance with the requirements of section 229.23,[2] taking into consideration the evidence presented by all the parties." Iowa Code § 229.14A.

## III. Substantial Evidence Analysis.

In order to be found to be seriously mentally impaired so as to justify involuntary commitment, a "person must first be found to be 'afflicted with a mental illness,' and consequently 'to lack sufficient judgment to make responsible decisions with respect to his or her hospitalization or treatment.'" *B.B.*, 826 N.W.2d at 432 (quoting *In re Oseing*, 296 N.W.2d 797, 799 (Iowa 1980)). In

---

[2] Iowa Code section 229.23 identifies the rights and privileges of hospitalized persons.

addition, "the person had to 'be likely, if allowed to remain at liberty, to inflict physical injury on himself or others or to inflict emotional injury on the designated class of persons'" or to be unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death. *Id.* (citation omitted); *see also* Iowa Code § 229.1(17).

On appeal S.L. challenges the dangerousness element, arguing there is insufficient evidence of dangerousness to justify the current placement.[3] She points out that the doctor testified he had no knowledge of her being dangerous or aggressive while at Penn Center. He only testified to her past history of aggression but did not testify to any recent specific incidents or overt acts of aggressive behavior. She also claims there is no evidence to support a conclusion that she is likely to inflict serious emotional injury on others. Finally, while she acknowledges the doctor testified he does not believe she is able to participate in usual activities of daily living such as taking care of herself due to her severe disorganization, she claims he could give no specific instances of this. In addition, she asserts there is no evidence the doctor's concerns would cause her physical injury, physical debilitation, or death. She points to her son's testimony that she had been able to take care of herself while at Penn Center and had previously lived independently. She claims her disorganization should not require her freedom to be restricted and with family support she could live independently.

---

[3] Iowa Code sections 229.31 and 229.37 provide the means for challenging a patient's current status of serious mental impairment.

Her treating physician at Penn Center testified that since being at the Penn Center S.L. "continues to have minimal insight into her disorder." The facility switched to liquid medication when she refused to take her pills, so that the medication "could not be cheeked." She stopped taking her medication entirely throughout the month of September insisting instead to take only "holistic methods." "S.L. continued to be very honest in terms of stating she would not take her medications upon discharge." The doctor recounted that at the November hearing, his plan was for her to switch to injectable medications so that she could be stable on her medication for at least three months but S.L. refused to allow that to happen. The doctor stated she continues to be focused on the death of her husband and feels that her children are keeping a large financial estate from her, which is not evidenced by the records. She had also stated that her children wanted to kill her to get the money and that she is the victim of the court and banking systems. She also thinks medication is bad primarily because of its association with red dye. The doctor stated that S.L. has told him she is ruled by Dr. Jesus and does not need medication.

The doctor's assessment was that she needed to be on injectable medication as the only way to have a successful transition back into the community, because without medication she will be a constant revolving door to and from institutions and perhaps even jail. It was his opinion she needed to stay at Penn Center until she is agreeable to taking the injectable medications so that they can initiate stability. There were not any "less restrictive placement options" for S.L. at the time of the hearing. The doctor maintained that if she were

released on an outpatient basis at that point, she would be a danger to herself or others. The doctor admitted S.L. had not been physically aggressive at Penn Center but stated she had been in the past. Because of S.L.'s severe disorganization, the doctor did not believe she would be able to "participate in usual activities of daily living, such as taking care of herself" in terms of normal hygiene, and clothing. The doctor reiterated that her history has a tendency to repeat itself especially if she is not going to take her medication.

S.L. has a history of noncompliance with medication, including the more recent refusal to take medication a few months before the district court hearing. The doctor stated that until S.L. is stabilized on injectable medication and agrees to continue taking the medication, she would once again be unable to take care of herself due to her severe disorganization and would repeat her aggressive tendencies. While the testimony of S.L.'s son could support a different conclusion, we do not find it persuasive. The son admitted to visiting his mother at Penn Center "a couple of times," and he had no knowledge of how she came to be hospitalized because he "wasn't around all the time" then.

Pursuant to section 229.14A, the district court considered the evidence presented by the parties regarding appropriate placement and determined placement should remain at Penn Center. The district court's findings of fact are supported by substantial evidence.

We next turn to S.L.'s claim that Penn Center is not the least restrictive placement option for her. A prior attempt at outpatient treatment lasted only a few months from December 2012 to February 2013 when S.L. once again

refused to take her medication. The doctor indicated he would be agreeable to allowing outpatient treatment so long as S.L. would agree to receive her medication via an injection to ensure she was taking it and for her to be stabilized on it for three months before she could be released. The doctor asserted injectable medication was the only way for S.L. to have a successful transition back into the community. We also conclude substantial evidence supports the court's findings that continued treatment at Penn Center is the least restrictive placement option for S.L. at this time.

Because we find substantial evidence supports the district court's order affirming the judicial hospitalization referee's decision, we affirm the placement order.

**AFFIRMED.**