## IN THE COURT OF APPEALS OF IOWA

No. 14-0989
Filed November 25, 2015

IN THE MATTER OF L.E.B.,
ALLEGED TO BE SERIOUSLY
MENTALLY IMPAIRED,

L.E.B.,
 Respondent-Appellant.

_____

 Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.

 L.B. appeals the district court ruling he is seriously mentally impaired and a person with a substance-related disorder. **REVERSED AND REMANDED WITH DIRECTIONS.**

 Zachary S. Hindman of Bikakis, Mayne, Arneson, Hindman & Hisey, Sioux City, for appellant.

 Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Assistant Attorney General, for appellee.

 Considered by Tabor, P.J., and Bower and McDonald, JJ.

**MCDONALD, Judge.**

L.B. challenges civil commitment orders issued pursuant to Iowa Code chapters 125 and 229 (2013). On appeal, L.B. claims the applicant failed to prove the grounds for civil commitment by clear and convincing evidence and he was denied due process.

I.

In June 2014, L.B. was involuntarily detained at a Sioux City hospital based on two separate applications filed by L.B.'s mother: the first alleging L.B. was a person with a substance-related disorder, as defined in Iowa Code chapter 125; and the second alleging L.B. was seriously mentally impaired, as defined in Iowa Code chapter 229. The applications were supported by affidavits filed by C.B. (while not explicitly stated, the record supports the fact this is L.B.'s sister).

Dr. Lindahl met with L.B. on several occasions. Dr. Lindahl approved and signed two physician's reports based on notes of her meetings with L.B. The physician's report regarding substance abuse stated L.B. "has very limited insight into his addiction and has self-reported he may not remain sober. . . . Patient has impaired judgment by his chronic substance abuse. Patient lacks insight into his addiction severity." The report listed diagnoses of substance abuse mood disorder, alcohol dependence, and methamphetamine dependence. It also noted L.B. was a danger to himself and others while he continued to abuse substances. The second physician's report addressed L.B.'s mental health. It noted L.B. "exhibits paranoia and is quite guarded. Patient has history of aggression

towards others. Patient reports racing thoughts." The report offered a diagnosis of depression not otherwise specified.

On June 10, 2014, a commitment hearing was held and the physician reports of Dr. Lindahl were entered into evidence without objection. Dr. Lindahl testified she met with L.B. three times. She noted L.B. tested positive for marijuana. Dr. Lindahl observed L.B. acted "very irritable, he was very angry, quite agitated with the situation at hand, and I believe his family and the police officers." L.B. had attended substance abuse treatment in the past, but had a history of not following through with the recommended treatment. Dr. Lindahl recommended that L.B. attend both substance abuse and mental health treatment. Upon questioning by the court, Dr. Lindahl acknowledged a social worker filled out the physician report regarding substance abuse, but the recommendations in the report were her own. L.B. testified at the hearing. He admitted telling Dr. Lindahl about his alcohol use, but he denied he drank every day. He admitted he had previously participated in outpatient treatment at Jackson Recovery but concluded it was a "money pit" and subsequently stopped attending. He admitted to having "racing thoughts." He also admitted to calling his sister from jail after he was arrested for drunk driving.

The district court found L.B. to be seriously mentally impaired, and if allowed to remain at liberty, likely to inflict injury on himself or others, or likely to inflict serious emotional injury on others. The court ordered L.B. to outpatient treatment. The court found L.B. was a person with a substance-related disorder and ordered outpatient substance abuse treatment.

4

II.

Involuntary civil commitments are special actions tried to the court as an action at law. *See In re Oseing*, 296 N.W.2d 797, 800–01 (Iowa 1980). We review the decision of the district court for errors at law. *See* Iowa R. App. P. 6.907. We are bound by the findings of the district court so long as they are supported by substantial evidence. *See In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). If a reasonable fact-finder could conclude the findings were supported by clear and convincing evidence, the evidence is substantial. *Id.*

In Iowa, an interested person may initiate proceedings "for the involuntary commitment or treatment of a person with a substance-related disorder . . . or for the involuntary hospitalization of a person pursuant to chapter 229 [regarding persons with a serious mental impairment] . . . by filing a verified application with the clerk of the district court." Iowa Code § 125.75. The applicant carries a heavy burden of proof in establishing commitment is necessary. *See* Iowa Code §§ 125.82(4), 229.12(3)(a). "[A] presumption in favor of the respondent" exists. *See* Iowa Code §§ 125.82(4), 229.12(3)(a). The applicant can overcome the presumption only with clear and convincing evidence "the respondent is a person with a substance-related disorder" or serious mental impairment. *See* Iowa Code §§ 125.82(4), 229.12(3)(c).

Civil commitment constitutes a significant deprivation of personal liberty. *See In re S.P.*, 719 N.W.2d 535, 537 (Iowa 2006). The deprivation of liberty can be justified only by an additional showing of dangerousness. The applicant thus

must establish by clear and convincing evidence the respondent presents a danger to himself or others if allowed to remain at liberty. *See* Iowa Code §§ 125.75(2)(a) (stating the applicant must believe "the respondent is a person who presents a danger to self or others"); 125.81(1) (requiring "probable cause to believe that the respondent . . . is likely to injure the person or other persons if allowed to remain at liberty"); 229.1(17) (defining "serious mental impairment" to include danger to self or others); *see also In re E.J.H.*, 493 N.W.2d 841, 843 (Iowa 1992) (stating there is "no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom"); *B.A.A. v. Chief Medical Officer, Univ. of Iowa Hosps.*, 421 N.W.2d 118, 123-24 (Iowa 1988) ("Thus, the state can no longer commit an individual solely because treatment is in the person's best interest under the parens patriae doctrine. There must also be a likelihood that the individual constitutes a danger to himself or others . . . In addition, this danger must be evidenced by a recent overt act, attempt, or threat.") (citation and internal marks omitted); *In re D.K.*, No. 14-1403, 2015 WL 3624391, at *2 (Iowa Ct. App. Jun. 10, 2015) (holding chapter 125 "incorporates a dangerousness requirement" as a prerequisite to commitment).

Determining whether a respondent poses a risk of danger "requires a predictive judgment, based on prior manifestations, but nevertheless ultimately grounded on future rather than past danger." *Oseing*, 296 N.W.2d at 801 (citation and internal marks omitted). The danger a person poses to himself or others must be evidenced by a "recent overt act, attempt or threat." *See J.P.*,

574 N.W.2d at 344. Behavior that is socially unacceptable, standing alone, does not satisfy the overt act requirement. *See In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986). Rather, an "overt act" implies past aggressive behavior or threats that manifest in the probable commission of a dangerous act upon the respondent himself or others. *In re Foster*, 426 N.W.2d 374, 378–79 (Iowa 1988). "Stringent proof under the dangerousness standard is necessary because predicting dangerousness is difficult and, at best, speculative." *Id.* at 377-78.

There is not clear and convincing evidence of a recent, overt act demonstrating L.B. is likely to commit a dangerous act upon himself or others. At the time of his detention at the hospital, L.B. tested positive for cannabinoids. He did not test positive for any other substance, including methamphetamine, barbiturates, benzodiazepines, cocaine, or opiates. At the time of his detention, L.B. was sober; his blood alcohol content indicated none. Dr. Lindahl testified L.B. initially presented as irritable with the "situation at hand," i.e., he was irritable at being detained, which seems understandable. Dr. Lindahl when on to testify that other than L.B.'s irritability with the "situation at hand," L.B. was "pleasant and talkative with [her]." Dr. Lindahl did testify "when [L.B.] is grossly intoxicated, he says things that he does not mean in a threatening manner." That is insufficient to establish an "overt act." *Foster*, 426 N.W.2d at 378–79 (holding verbalized delusions do not constitute the type of overt act necessary to establish dangerousness). Dr. Lindahl did not testify L.B. actually made any threats, only that he "says things he does not mean in a threatening manner." There is thus

no evidence of any threat. Even if this testimony could be construed to mean L.B. made threats, there is no evidence showing when the alleged threats were made. There is thus no evidence of recentness. There is also no evidence regarding the nature of the threats, whether they were threats of physical harm to himself or others or threats of some other type of action. There is thus no evidence of dangerousness. *See id.* ("We reject the applicant's argument that the overt act itself need not necessarily involve a threat or an act of unprovoked physical aggression on the part of the respondent. Such an approach would tend to increase the incidence of error in predicting dangerousness, thus compounding the problem of uncertainty in this area."). Further, Dr. Lindahl testified L.B. does not mean the things he says. There is thus no evidence of threats that manifest in "the probable commission of a dangerous act upon" the respondent himself or others. *See id.* at 378.

The written materials provide no greater support for the detention of L.B. While the person who completed the preprinted physician's report wrote "yes" in response to a question regarding dangerousness, the person completing the report did not provide any information supporting the conclusion. This is insufficient information to establish dangerousness. *See* Iowa Ct. Rs. 12.13 (providing the physician's report "shall contain" the "physician's diagnosis and recommendations with a detailed statement of the facts, symptoms and overt acts observed or described to the physician"); Iowa Court R. 13.13 (providing the physician's report shall contain "a detailed statement of the observations of

medical history which led to the diagnosis"); *In re S.L.*, Nos. 9-473, 98-6328, 1999 WL 975740, at *2-3 (Iowa Ct. App. Oct. 27, 1999) (reversing commitment where physician's report "provided no facts" supporting conclusion). Similarly, the family members' respective affidavits lack clear and convincing evidence of a recent, overt act demonstrating L.B. presents a danger to himself or others as required by chapters 125 and 229.

In addition to challenging the sufficiency of the evidence, L.B. contends the admission into evidence of the application and affidavits in support of his commitment violated his due process rights. L.B.'s due process claim is not preserved for our appellate review. "'It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.'" *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)). Our error preservation rules apply with equal force to constitutional issues. *See Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 322 (Iowa 2013) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal."). L.B.'s counsel objected to the admission of the affidavits as hearsay. The court overruled the objection. However, L.B.'s counsel did not raise the violation of L.B.'s due process rights. Therefore L.B.'s due process claim is not preserved.

III.

We conclude there is not clear and convincing evidence establishing L.B. poses a probable risk of danger to himself or others as evidence by a recent

overt act. We reverse the district court's involuntary commitment orders and remand this case to the district court with directions to terminate L.B.'s commitment.

**REVERSED AND REMANDED WITH DIRECTIONS.**

Tabor, P.J., concurs; Bower, J., dissents.

**BOWER, Judge.** (dissenting)

I respectfully dissent. The majority cites the law correctly and there is no need to add to that discussion. However, I do find other facts and circumstances demonstrating there is clear and convincing evidence to affirm the district court. Regarding the substance-related disorder, the respondent self reported (to the treating physician) he drinks a six pack of tall boys and two-thirds of a liter of bourbon every day. The respondent, at the time of his initial commitment, was belligerent and threatened both his family and law enforcement. The fact the respondent drinks every day, drives a vehicle after drinking, and drunkenly calls his sister from various venues persuades me the respondent suffers from a substance-related disorder. I am also convinced the actions the respondent displayed show a recent dangerous act.

I also find clear and convincing evidence supports the district court's finding that the respondent is seriously mentally impaired. The respondent was prescribed Remeron (a potent drug used to treat major depressive disorders) as a result of his commitment. The evidence shows the respondent regularly drank exorbitant amounts of alcohol to self-medicate. The respondent was previously committed for being suicidal, and the affidavit of M.W., presumably the respondent's mother, stated the respondent was crying and made statements that prompted her to believe the respondent was once again suicidal. I would also note, the respondent testified and admitted he suffers from depression, but that he "[n]ever had this kind of depression before."

After being seen by the treating physician three times when first admitted, the statements attributed to him by the physician, and the evidence provided by his mother, his sister, and his own testimony, I find present clear and convincing evidence to support both orders and I would affirm the district court.